**James Otto EARHART, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 70343.

Court of Criminal Appeals of Texas, En Banc.

April 6, 1994.

Kyle Hawthorne, (Court appointed), Bryan, Jeffrey J. Pokorak, (on remand only), San Antonio, for appellant.

Bill Turner, Dist. Atty., Deena J. McConnell, Asst. Dist. Atty., Bryan, Robert Huttash, State's Atty., Austin, for the State.

Before the court en banc.

## OPINION ON REMAND FROM THE UNITED STATES SUPREME COURT

BAIRD, Judge.

On original submission we affirmed the judgment of the trial court. *Earhart v. State*, 823 S.W.2d 607 (Tex.Cr.App.1991). However, the United States Supreme Court granted appellant's petition for writ of certiorari, vacated our judgment and remanded the case for further consideration in light of *Johnson v. Texas*, 509 U.S. ——, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993).[1] We will again affirm.

### I.

At the time of appellant's trial, the punishment for the offense of capital murder was determined by the jury's responses to the following punishment issues submitted pursuant to Tex.Code Crim.Proc.Ann. art. 37.-071(b):

(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.

If the jury unanimously answered the issues in the affirmative, a sentence of death was mandatory. Art. 37.071(e). If ten jurors answered any issue in the negative, or if the jury was unable to answer any issue, the defendant was sentenced to life imprisonment. *Id.*[2]

### II.

In his first point of error, appellant contends art. 37.071 failed to provide the jury with a vehicle to consider and give effect to his mitigating evidence. *See,* n. 1, *supra.* On original submission, we found appellant presented the following mitigating evidence:

1) Appellant's uncle testified that appellant's father "treated [appellant] badly" when appellant was a child;

2) Appellant often drank a case to a case and a half [of beer] a day;

3) A psychiatrist testified that appellant suffered from various psychological and

---

1. In his petition for writ of certiorari appellant contended:

I.

The trial court erred by failing to provide an adequate vehicle for the consideration of Mr. Earhart's mitigating evidence the substantial thrust of which, although indicating a reduced moral culpability, was aggravating under the second issue in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

II.

The trial court erred in failing to provide adequate definitions of the operative terms in the second special issue, rendering that necessary predicate to a sentence of death unconstitutional under the Eighth and Fourteenth Amendments to the United States Constitution.

2. Acts 1973, 63rd Leg., p. 1125, ch. 426, art. 3 § 1, eff. June 14, 1973. This capital sentencing scheme was enacted in response to *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (decided in conjunction with *Branch v. Texas*), wherein the Supreme Court held the Texas capital sentencing scheme violated the Eighth and Fourteenth Amendments to the United States Constitution. *Id.*, 408 U.S. at 239–240, 92 S.Ct. at 2727. Although art. 37.071 did not initially address the jury's inability to answer one of the statutory punishment issues, art. 37.071 was amended in 1985 to address this situation. Acts 1985, 69th Leg., ch. 44, § 2, eff. Sept. 1, 1985.

psychiatric problems and was "not dealing with a full deck;" [and]

4) Appellant's mother testified that appellant provided support for her. Appellant often picked food from supermarket dumpsters and would use that food to feed his mother and older neighbors in the neighborhood.

*Earhart,* 823 S.W.2d at 632. Although our factual rendition of appellant's mitigating evidence on original submission is accurate, for the purposes of this opinion we will more fully develop the testimony appellant contends is mitigating.

Robert Hayes, appellant's uncle, testified appellant visited Hayes' home several times a year and was around Hayes' nine-year-old daughter. Appellant normally consumed a case to a case and a half of beer a day. Hayes further testified that he heard appellant's stepfather mistreated appellant.

Appellant's sister, Johnnie Ruth Johnson, testified she loved appellant and that appellant never mistreated her children. Johnson further stated appellant was a gentle, loving person who took care of his mother. Johnson did not believe appellant would be a continuing threat to society.

Appellant's cousin, Sharon Mae Brown, testified she had no concern or fear of appellant around her children. To her knowledge, no one was ever concerned with appellant around children. Brown testified appellant lived with and cared for his mother.

Clyde Wilson, pastor of Emanuel Baptist Church in Bryan, testified that appellant's mother was a member of his congregation and appellant drove his mother to church and picked her up after the services. Wilson visited with appellant several times during his incarceration discussing "the scriptures, the Bible, and the spiritual life." Appellant was courteous and never appeared to be violent.

Luke Ruffino owned the home rented by appellant's mother. Appellant gave Ruffino reconditioned appliances and Ruffino never

perceived appellant to be violent or a threat to society.

Lynn Thomas testified he owned an air conditioning and appliance service. Thomas and appellant helped each other fix broken appliances and traded parts. Thomas observed appellant in the company of Thomas' children and had no concern for their safety.

Blanche McShane, appellant's aunt, testified appellant lived next door to her when he was young. Appellant and his stepfather "didn't get along." Blanche McShane did not believe appellant to be a violent person or a threat to society.

Lynn McShane, appellant's cousin, grew up with appellant. Lynn McShane testified appellant was always gentle and respectful to the McShane children. Lynn McShane did not believe appellant to be a violent person.

Dr. Fred Fason, a psychiatrist, testified he determined, based upon a one hour interview with appellant and appellant's performance on a standardized psychological test, that appellant was sane at the time of his offense and not sociopathic.[3] However, appellant had a very low "ego strength score" on the standardized test. According to Fason, the test "measures a person's ability to deal with reality, the ability to deal with other people, the ability to get what they want, their economic self-sufficiency, [and] their common sense." Fason further determined appellant's "lifestyle and . . . history are consistent with an individual who is psychotic." The symptoms exhibited by appellant were:

> . . . symptoms of an individual that is not—in lay terms not dealing with a full deck, or in psychological terms or psychiatric terminology that is—sounds like the behavior that you expect from someone who is psychotic, not from someone that is sociopathic.

Fason saw appellant "as an individual who is borderline psychotic vulnerable to a psychotic decompensation with marked feelings of inadequacy and inferiority. . . ."

Appellant's mother, Ida Mae Sprayberry, testified appellant was living with her at the

---

**3.** This testimony was presented at the guilt/innocence phase of the trial to explain appellant's

flight after the murder.

time of the instant offense. Appellant helped her with the house, took her to church and did whatever he could for her. Appellant had a "nervous condition" that was aggravated by the loud speaker from the drive-in restaurant across the street from their home. At times the nervous condition required appellant to "go inside and lie down." Sprayberry stated appellant searched supermarket dumpsters two or three times each day. At times he would find food or canned goods. Sprayberry and appellant would eat a portion of the food and give the remainder to neighbors in need.

### III.

#### A.

■ In *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), the Supreme Court held our capital sentencing scheme constitutional. The Court stated:

> Texas has provided a means to promote the evenhanded, rational and consistent imposition of death sentences under law. Because this system serves to assure that sentences of death will not be "wantonly" or "freakishly" imposed, it does not violate the Constitution.

*Id.*, 428 U.S. at 276, 96 S.Ct. at 2958. However, the Court cautioned, "[a] jury must be allowed to consider on the basis of all relevant evidence not only why a death sentence should be imposed, but also why it should not be imposed." *Id.*, 428 U.S. at 271, 96 S.Ct. at 2956. The Court recognized our assurance that a defendant would be allowed "to bring to the jury's attention whatever mitigating circumstances he may be able to show." *Id.*, 428 U.S. at 272, 96 S.Ct. at 2956.

Twelve years later, the Supreme Court again addressed the constitutionality of our capital sentencing scheme.[4] *Franklin v. Lynaugh*, 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988). Franklin contended art.

37.071 was unconstitutional because his jury was unable to consider his good conduct record in prison. However, the Supreme Court held the second statutory punishment issue allowed the jury to consider such evidence. *Id.*, 487 U.S. at 177, 108 S.Ct. at 2329. In a concurring opinion Justice O'Connor expressed her concerns regarding art. 37.071:

> Under the sentencing procedure followed in this case the jury could express its views about the appropriate punishment only by answering the special verdict questions regarding the deliberateness of the murder and the defendant's future dangerousness. To the extent that the mitigating evidence introduced by [Franklin] was relevant to one of the special verdict questions, the jury was free to give effect to that evidence by returning a negative answer to that question. If, however, petitioner had introduced mitigating evidence about his background or character or the circumstances of the crime that was not relevant to the special verdict questions, or that had relevance to the defendant's moral culpability beyond the scope of the special verdict questions, the jury instructions would have provided the jury with no vehicle for expressing its "reasoned moral response" to that evidence.

*Id.*, 487 U.S. at 186, 108 S.Ct. at 2333 (O'Connor, J., concurring).

#### B.

In *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934 (1989), Justice O'Connor's concerns were realized. Penry presented mitigating evidence of mental retardation and organic brain damage resulting in poor impulse control and the inability to learn from experience.[5] There was further evidence Penry was physically and mentally abused as a child. *Id.*, 492 U.S. at 309, 109 S.Ct. at

---

4. Since *Jurek*, we have rejected many challenges to the constitutionality of art. 37.071. *See, Stewart v. State*, 686 S.W.2d 118 (Tex.Cr.App.1984); *Phillips v. State*, 701 S.W.2d 875 (Tex.Cr.App. 1985); *Fierro v. State*, 706 S.W.2d 310 (Tex.Cr. App.1986); *Demouchette v. State*, 731 S.W.2d 75 (Tex.Cr.App.1986); *and, Cordova v. State*, 733 S.W.2d 175 (Tex.Cr.App.1987).

5. Penry's I.Q. before trial was 54. According to one expert witness Penry had the mental age of a 6½ year old child. *Penry*, 492 U.S. at 308, 109 S.Ct. at 2941.

2941.[6] The Supreme Court held art. 37.071 did *not* provide the jury a vehicle to consider and give effect to Penry's mitigating evidence. The Court stated:

> ... [A] juror who believed that Penry's retardation and background diminished his moral culpability and made imposition of the death penalty unwarranted would be unable to give effect to that conclusion if the juror also believed that Penry committed the crime "deliberately."
>
> \* \* \* \* \* \*
>
> Penry's mental retardation and history of abuse is thus a two-edged sword: it may diminish his blameworthiness for his crime even as it indicates that there is a probability that he will be dangerous in the future ... The second special issue, therefore, did not provide a vehicle for the jury to give mitigating effect to Penry's mitigating evidence....

*Id.,* 492 U.S. at 323, 109 S.Ct. at 2949. The Court found the appropriateness of a death sentence is not ensured when the jury is unable to consider and give effect to mitigating evidence relevant to a defendant's "background, character, or the circumstances of the crime." *Id.,* 492 U.S. at 328, 109 S.Ct. at 2951.

The Supreme Court's opinion in *Penry* provided scant guidance for future application. The Court did not provide a framework to review "*Penry* claims" and determine whether the jury was able to consider and give effect to specific mitigating evidence under art. 37.071. Further, the Court did not address what vehicle was required when mitigating evidence fell beyond the scope of the statutory punishment issues. Unfortunately, the Supreme Court's subsequent opinions concerning *Penry* shed little light on these issues.

In *Graham v. Collins,* —— U.S. ——, 113 S.Ct. 892, 122 L.Ed.2d 260 (1993), Graham contended art. 37.071 did not allow his jury to consider and give effect to mitigating evidence of youth, family background, and posi-

tive character traits. *Id.,* —— U.S. at ——, 113 S.Ct. at 895. In holding Graham's challenges were not cognizable on federal habeas corpus review the Court stated:

> We do not read *Penry* as effecting a sea change in this Court's view of the constitutionality of the former Texas death penalty statute; it does *not·* broadly suggest the invalidity of the special issue framework.

*Id.,* —— U.S. at ——, 113 S.Ct. at 901 (emphasis in·original).

In *Johnson v. Texas,* —— U.S. ——, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993), Johnson contended art. 37.071 failed to provide the jury with a vehicle to consider and give effect to his mitigating evidence of youth. *Id.,* —— U.S. at ——, 113 S.Ct. at 2660. Johnson was nineteen years of age at the time of his capital offense. *Id.,* —— U.S. at ——, 113 S.Ct. at 2663.[7] Recognizing evidence of youth may be mitigating, the Supreme Court held:

> ... The relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside. We believe that there is ample room in the assessment of future dangerousness for a juror to take account of the difficulties of youth as a mitigating force in the sentencing determination.

*Id.,* —— U.S. at ——, 113 S.Ct. at 2669. The Court concluded *Penry* does not require that the jury to be able to give effect to mitigating evidence in every conceivable manner in which it might be relevant; mitigating evidence must only be within "the effective reach of the sentencer." *Id.,* —— U.S. at ——, 113 S.Ct. at 2671. *See also, Graham,* —— U.S. at ——, 113 S.Ct. at 901–902.

### C.

With almost four hundred persons on death row in Texas, our struggle to apply *Penry* is well chronicled. We have reviewed many purported "*Penry* claims." *See e.g., Ex parte Goodman,* 816 S.W.2d 383 (Tex.Cr.

---

**6.** As a child Penry was beaten over the head with a belt and routinely locked in his room without access to a toilet for long periods of time. *Penry,* 492 U.S. at 309, 109 S.Ct. at 2941.

**7.** Appellant was forty-three years of age at the time of the instant offense.

App.1991) (mental retardation, possible brain damage, violent family background and growing up in poverty); *James v. State,* 805 S.W.2d 415 (Tex.Cr.App.1990) (voluntary intoxication); *Ex parte Ellis,* 810 S.W.2d 208 (Tex.Cr.App.1991) (drug abuse, suicide attempt, and lack of education); *Ex parte Baldree,* 810 S.W.2d 213 (Tex.Cr.App.1991) (being a good and loving child, critical illness as child, voluntary service, and good character evidence); *Lewis v. State,* 815 S.W.2d 560 (Tex.Cr.App.1991) (abusive childhood and remorse); *Black v. State,* 816 S.W.2d 350 (Tex. Cr.App.1991) (prior military service, being a boy scout, and general good character evidence); *and, Ex parte Herrera,* 819 S.W.2d 528 (Tex.Cr.App.1991) (mental instability, supportive family, police brutality after arrest, and remorse). However, we have sustained *"Penry* claims" in only three situations. First, we held evidence of mental retardation falls beyond the scope of the statutory punishment issues. *Goodman, supra; Ramirez v. State,* 815 S.W.2d 636 (Tex. Cr.App.1991); *Ex parte McGee,* 817 S.W.2d 77 (Tex.Cr.App.1991); *and, Richard v. State,* 842 S.W.2d 279 (Tex.Cr.App.1992). Second, mental illness may fall beyond the scope of the statutory punishment issues. *Gribble v. State,* 808 S.W.2d 65, 76 (Tex.Cr.App.1990). Finally, we held the statutory punishment issues failed to provide the jury with a vehicle to consider and give effect to evidence of provocation by the second victim in a prosecution for capital murder under Tex.Penal Code Ann. § 19.03(a)(6). *First v. State,* 846 S.W.2d 836, 842 (Tex.Cr.App.1992).

■ To resolve *Penry* claims we have adopted a "nexus" requirement. *Goss v. State,* 826 S.W.2d 162 (Tex.Cr.App.1992). To obtain relief under *Penry,* a defendant must establish a nexus between the mitigating evi-

dence and the circumstances of the offense which tend to excuse or explain the commission of the offense, suggesting that the defendant is less deserving of a death sentence. *Mines v. State,* 852 S.W.2d 941, 951 (Tex.Cr. App.1992). In other words,

> ... Where the evidence presented by defendant's witnesses failed to show a connection between the events they described and the commission of the crime, then that "evidence is not relevant, *beyond the scope of the special issues,* to the jury's individualized assessment of Appellant's moral culpability for the crime."

*Nobles v. State,* 843 S.W.2d 503, 506 (Tex.Cr. App.1992) (quoting *Goss,* 826 S.W.2d at 166) (Emphasis in original.) [8]

Under our nexus requirement the mitigating evidence must be directly linked to the defendant's moral culpability for the capital murder.[9] In *Richardson v. State,* 879 S.W.2d 874 (Tex.Cr.App.1993), the defendant presented the following mitigating evidence:

> ... his mother was "in and out" of penal institutions and had little to do with his upbringing; that he never knew his father; that when he was very young, he and his six siblings were raised by his maternal grandmother in substantial poverty and with little supervision; that sometimes he and his siblings went hungry for lack of food; that sometimes "they would go out and steal, go in other people's houses [looking for] food ... to survive"; that [Richardson] got "in trouble with the law ... twelve times ... for stealing something to eat"; that sometimes, when his mother was around, she "would go in the stores and entertain the clerks while the children [were] taking food—taking clothes and what they wanted out of the stores";

---

8. The requirement of a nexus is derived from Justice O'Connor's concurring opinion in *California v. Brown,* 479 U.S. 538, 545, 107 S.Ct. 837, 841, 93 L.Ed.2d 934 (1987) ("... [D]efendants who commit criminal acts that *are attributable to* a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.") (emphasis added). *See also, Penry,* 492 U.S. at 319, 109 S.Ct. at 2947; *and, Lackey v. State,* 819 S.W.2d 111, 135 n. 10 (Tex.Cr.App.1989) (opinion on rehearing).

9. However, we do not require proof of a nexus when the defendant presents evidence of mental retardation. *See, Ex parte Goodman,* 816 S.W.2d 383, 386 (Tex.Cr.App.1991); *Ramirez v. State,* 815 S.W.2d 636, 656 (Tex.Cr.App.1991); *and, Richard v. State,* 842 S.W.2d 279, 283 (Tex.Cr. App.1992) ("[S]ince *Nobles* was decided, the Court has still not required an express showing of 'nexus' between evidence of mental defectiveness and the offense on trial.").

that when [Richardson] was nine or ten years old, he was sent by state authorities to the Texas Boys Ranch and, later, to the Giddings State School; that when he arrived at the Texas Boys Ranch, he was illiterate, stuttered badly, and was a "slow learner"; and that he was released from state care when he was fifteen or sixteen years old.

*Id.,* 879 S.W.2d at 883. We rejected Richardson's contention that the jury was unable to consider and give effect to this mitigating evidence, holding:

... [Richardson] has made no showing that, from the viewpoint of society as a whole, his alleged childhood experience of poverty, parental neglect, illiteracy, and a speech disorder tends to excuse his capital crime. He has also made no showing that the alleged fact that his mother taught him to shoplift tends to excuse his capital crime.

\* \* \* \* \* \*

Our conclusion might be different if [Richardson] had presented evidence that his mother had taught him to kill or commit other crimes of violence, or if his capital crime had begun as a robbery. Such evidence might, from the viewpoint of society as a whole, tend to excuse appellant's criminal behavior in that it might indicate that his personality had been damaged through no fault of his own and that his capital crime was caused in part by that damaged personality.

*Id.,* —— S.W.2d at ——. With the foregoing in mind, we now turn to review appellant's mitigating evidence in light of our previous interpretations of *Penry* and its progeny.

### IV.

 Art. 37.071 allows the jury to consider and give effect to evidence of positive character traits such as kindness to others and religious devotion.[10] In *Black v. State,* 816 S.W.2d 350 (Tex.Cr.App.1991), we held:

... Appellant's mitigating evidence suggests that he is generally a benevolent and

non-violent individual and that the commission of this offense was an aberration. This evidence had relevancy directly within the scope of the second punishment issue and was truly mitigating. We determine that an additional instruction was not needed so that the jury could express its "reasoned moral response" in answering the punishment issues.

*Black,* 816 S.W.2d at 365. We find appellant's mitigating evidence demonstrating positive character traits does not differ in any material way from the evidence present in *Black.* Therefore, we hold the jury was able to consider and give effect to appellant's positive character traits through the statutory punishment issues of art. 37.071.

 We believe appellant's evidence concerning his poor relationship with his stepfather is analogous to that in *Lewis v. State,* 815 S.W.2d 560 (Tex.Cr.App.1991). In *Lewis,* the defendant presented testimony that he was seen with bruises as a child and did not have a happy childhood. We recognized that certain circumstances in a defendant's background or character could make the defendant less morally culpable than others who commit capital murder. *Id.,* 815 S.W.2d at 567. *See also, California v. Brown,* 479 U.S. 538, 545, 107 S.Ct. 837, 841, 93 L.Ed.2d 934 (1987) (O'Connor, J., concurring). However, we held: "... we do not believe the people of Texas hold any such belief as regards persons who, as children ... were once unhappy or frightened of their parents for undisclosed reasons...." *Lewis,* 815 S.W.2d at 567. Appellant did not develop the mitigating evidence concerning his relationship with his step-father. The record reveals only that the two did not "get along" and that the step-father "mistreated" appellant. There is no evidence providing the extent of any mistreatment. Consequently, we find the jury was able to consider and give effect to appellant's mitigating evidence through the statutory punishment issues.

---

10. A large portion of appellant's mitigating evidence can be characterized as evidence of positive character traits: appellant's giving appliances to Ruffino and food to his neighbors; appellant's bible study and courteous manner with pastor Wilson; appellant's efforts to care for his mother; and, appellant's behavior around children.

Appellant further contends evidence of his alcohol consumption cannot be given effect within art. 37.071. We have held that evidence of substance abuse, "unlike the evidence of mental retardation in *Penry*, does not make appellant less morally culpable for his adult behavior according to contemporary moral values as shared by a significant segment of our society." *Beavers v. State*, 856 S.W.2d 429, 433 (Tex.Cr.App.1993). *See also*, *Draughon v. State*, 831 S.W.2d 331, 339 (Tex. Cr.App.1992); *Ex parte Kelly*, 832 S.W.2d 44, 46 (Tex.Cr.App.1993); *Ex parte Kunkle*, 852 S.W.2d 499, 503 (Tex.Cr.App.1993); *Lane v. State*, 822 S.W.2d 35 (Tex.Cr.App. 1991); *and*, *Lackey v. State*, 819 S.W.2d 111 (Tex.Cr.App.1991) (opinion on rehearing). Therefore, appellant's alcohol consumption does not require an additional instruction.

Finally, appellant contends the jury was unable to consider and give effect to the mitigating evidence regarding his low "ego strength score," the possibility of a "psychotic decompensation," and appellant's nervous condition. We acknowledge this testimony is mitigating and may, in some situations, fall beyond the scope of the statutory punishment issues. However, in this case there is no nexus between the mitigating evidence and the commission of the crime. *See*, *Goss*, 826 S.W.2d at 162; *and*, *Nobles*, 843 S.W.2d at 503. There is no testimony concerning what a "psychotic decompensation" might entail, or what significance appellant's nervous condition had on his behavior. Although extensive testimony attributed appellant's flight from the crime scene to his low ego strength score, there was no testimony that appellant's commission of the capital offense was in some way attributable to his low ego strength score. *See*, *Richardson*, *supra*. Because appellant's mitigating evidence does not tend to excuse or explain the commission of the offense, suggesting appellant is less

deserving of a death sentence, *Mines*, 852 S.W.2d at 951, we hold that no instruction was required for the jury to consider and give effect to appellant's mitigating evidence.

Appellant's first point of error is overruled.

## V.

In his second point of error, appellant contends the trial judge erred by not defining "probability," "criminal acts of violence," "continuing threat," and "society" in the punishment charge. *See*, n. 1, *supra*. On original submission we held:

> This Court has repeatedly held that the terms "deliberately," "probability," "criminal acts of violence" and "continuing threat to society," all terms contained in Tex. Code Crim.Proc.Ann. art. 37.071, require no special definitions. *Fearance v. State*, 771 S.W.2d 486, 513 (Tex.Cr.App.1988); *King v. State*, 553 S.W.2d 105, 107 (Tex.Cr. App.1977). Appellant's ... point of error is therefore overruled.

*Earhart*, 823 S.W.2d at 632. Appellant now contends the Supreme Court in *Johnson* transformed the second punishment issue into the jury's sole expression on appellant's moral culpability. Therefore, appellant contends the second punishment issue is facially vague and violates the Eighth and Fourteenth Amendments and *Johnson* because the sentencing jurors were not adequately instructed regarding limitations on the application of aggravating circumstances. We disagree. In *Johnson*, the Supreme Court merely held evidence of youth was directly relevant to the second punishment issue. The *Johnson* Court did not address whether the second punishment issue was vague or whether the Constitution required the terms within the statutory punishment issues be defined.[11]

11. The only occasion in which the Supreme Court has considered whether the terms within the second statutory punishment issue should be defined was in *Jurek*, *supra*. The Court held:
 The second Texas statutory question asks the jury to determine "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society" if he were not sentenced to death. The Texas Court of Criminal Appeals has

yet to define precisely the meanings of such terms as "criminal acts of violence" or "continuing threat to society." In the present case, however, it indicated that it will interpret this second question so as to allow a defendant to bring to the jury's attention whatever mitigating circumstances he may be able to show.... *Jurek*, 428 U.S. at 278, 96 S.Ct. at 2956.
 In *Penry*, the Supreme Court considered the lack of definition for "deliberate," in the first

■ We have consistently rejected claims that the second statutory punishment issue was constitutionally infirm for failure to define its operative terms. *Cuevas v. State*, 742 S.W.2d 331, 346–347 (Tex.Cr.App.1987) (" 'Probability' does not have a statutory definition, thus, it is to be taken and understood in its usual acceptation in common language."); *Wicker v. State*, 667 S.W.2d 137, 143 (Tex.Cr.App.1984); *and, Barefoot v. State*, 596 S.W.2d 875, 887 (Tex.Cr.App.1980). The operative terms of the second statutory punishment issue, taken and understood in their usual acceptation in common language, allow the jury to consider and give effect to mitigating evidence which fall within their scope. Neither *Penry, Graham* nor *Johnson* suggest otherwise. Appellant has shown no constitutional infirmity in our capital sentencing scheme. Point of error two is overruled.

We affirm our holding on original submission. The judgment of the trial court is affirmed.

MALONEY, J., concurs in the result.

CLINTON, J., dissents.

statutory punishment issue. However, this review was in relation to Penry's mitigating evidence which, partially because of the failure to define "deliberate," fell outside the scope of the punishment issue. *Id.*, 492 U.S. at 322–323, 109 S.Ct. at 2948–2949.