IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






AP-74,983





CALVIN LETROY HUNTER, Appellant



v.



THE STATE OF TEXAS





ON DIRECT APPEAL FROM CAUSE NO. 968719


IN THE 230TH JUDICIAL DISTRICT COURT


HARRIS COUNTY






 Meyers, J., delivered the opinion for a unanimous Court.


O P I N I O N



 In July 2004, a jury convicted appellant of a capital murder committed on October
25, 2003. Tex. Penal Code Ann. § 19.03(a)(2). Based on the jury's answers to the
special issues set forth in Texas Code of Criminal Procedure Article 37.071, sections 2(b)
and 2(e), the trial judge sentenced appellant to death. Art. 37.071, § 2(g). (1) Direct appeal to
this Court is automatic. Art. 37.071, § 2(h). After reviewing appellant's seven points of
error, we find them to be without merit. Consequently, we affirm the trial court's judgment
and sentence of death.

MENTAL RETARDATION

A. Sufficiency of Mental-Retardation Evidence

 In his first point of error, appellant challenges the sufficiency of the evidence
supporting the jury's determination that he is not mentally retarded. In Atkins v. Virginia,
536 U.S. 304 (2002), the United States Supreme Court held that it is unconstitutional to
execute one who is mentally retarded. The Court left to the individual states the job of
establishing the substantive and procedural mechanisms to implement that holding. Id. In
three legislative sessions, the Texas Legislature has not established a statutory scheme for
the presentation and determination of an issue of mental retardation in a capital- murder
trial. In the absence of legislative action, this Court has formulated temporary judicial
guidelines in addressing Atkins claims. Ex parte Briseno, 135 S.W.3d 1, 5 (Tex. Crim.
App. 2004). This Court defines mental retardation as a disability characterized by: (1)
"significantly subaverage" general intellectual functioning; (2) accompanied by "related"
limitations in adaptive functioning; (3) the onset of which occurs prior to the age of 18. Id.
at 7. Other evidentiary factors that fact finders in the criminal-trial context might also
focus upon in weighing evidence as indicative of mental retardation include:

Did those who knew the person best during the developmental stage--his
family, friends, teachers, employers, authorities--think he was mentally
retarded at that time, and, if so, act in accordance with that determination?


Has the person formulated plans and carried them through or is his conduct
impulsive?


Does his conduct show leadership or does it show that he is led around by
others?


Is his conduct in response to external stimuli rational and appropriate,
regardless of whether it is socially acceptable?


Does he respond coherently, rationally, and on point to oral or written
questions or do his responses wander from subject to subject?


Can the person hide facts or lie effectively in his own or others' interests?


Putting aside any heinousness or gruesomeness surrounding the capital 

offense, did the commission of that offense require forethought, planning,
and complex execution of purpose?


Id. at 8-9. Although a jury determined the issue of mental retardation in this case, it is
important to note at the outset that a jury determination of mental retardation is not
required. See Schriro v. Smith, 546 U.S. 6, 7 (2005) (holding that the Ninth Circuit erred
in requiring Arizona courts to conduct a jury trial to resolve mental-retardation claim); see
also Briseno, 135 S.W.3d at 9 (holding that Atkins does not require a jury determination of
mental retardation in a post-conviction proceeding). With this overview, we now turn to
appellant's point of error. 

 Appellant claims the evidence is factually insufficient to support the jury's
determination that he is not mentally retarded, and he argues that the jury's verdict was so
against the great weight and preponderance of the evidence as to be manifestly unjust. The
question of whether appellant was mentally retarded was submitted to the jury as "Special
Issue No. 1" in the punishment charge: "Do you find by a preponderance of the evidence
that the defendant, Calvin Letroy Hunter, is a person with mental retardation?" The jury
unanimously answered this special issue in the negative.

 This Court held in Briseno that the mental-retardation issue is like the affirmative
defenses of insanity, incompetency to stand trial, and incompetency to be executed. 135
S.W.3d at 12. Thus, in a habeas action, a defendant has the burden to prove mental
retardation by a preponderance of the evidence. Id. Similarly, we held that when the issue
is presented at trial, a defendant bears the burden of proof, by a preponderance of the
evidence, to establish that he is mentally retarded. Gallo v. State, 2007 Tex. Crim. App.
LEXIS 1234 at *26 (Tex. Crim. App. Sept. 26, 2007). In evaluating the sufficiency of the
evidence to support a jury's determination that a defendant is not mentally retarded, we
must consider all of the evidence relevant to the issue and evaluate whether "the judgment
is so against the great weight and preponderance of the evidence so as to be manifestly
unjust." See Meraz v. State, 785 S.W.2d 146, 155 (Tex. Crim. App. 1990) (conducting a
factual-sufficiency review of affirmative defense of insanity); see also Bigby v. State, 892
S.W.2d 864, 875 (Tex. Crim. App. 1994) (also conducting factual- sufficiency review of
insanity affirmative defense), and Watson v. State, 204 S.W.3d 404, 437 (Tex. Crim. App.
2006)(Cochran, J., concurring)(stating we should continue to follow the Meraz/Bigby
standard of review when the proponent bears the burden of proof by a preponderance of the
evidence). 

 The defense presented expert witness Dr. Richard Garnett, a psychologist in private
practice with thirty-five years of experience in the field of mental retardation. While
Garnett did not administer any IQ or adaptive behavior tests to appellant, he personally
interviewed appellant for two hours on May 21, 2004. Garnett testified that appellant
verbally "communicated very well" but that appellant demonstrated "no understanding
beyond [a] conversational hook." In addition to interviewing appellant and several members
of his family, Garnett reviewed appellant's available school records, criminal justice
records, job history records, reports from prior testing of the appellant, and the results of
testing conducted by the State's expert.

 Garnett testified that when appellant was eight years old and in the third grade, a
school psychologist administered intellectual and adaptive behavior tests to appellant. 
Appellant achieved a verbal IQ score of 65, a performance IQ score of 68, and a full-scale
IQ score of 64 on the Wechsler Intelligence Scale for Children. Appellant was identified
by the school district as "educable mentally handicapped" and placed in the special-education program. Appellant progressed slowly academically, displayed behavior
problems, and was expelled from elementary school for fighting. Madonna Mahew,
appellant's aunt, lived with appellant when he was seven through eleven years old and helped
him extensively with his schoolwork. Mahew testified that appellant was "slow to pick
things up" and was nearly held back in the fifth grade. Appellant continued with special-education classes through high school. He was required to repeat the tenth grade and
graduated with a "special diploma" after completing the eleventh grade. Apart from the
testing conducted when he was in third grade, appellant's school records do not include any
reports of any regular or repeated psychological testing.

 Lulu Thorpe, who taught appellant special-education language arts at Paxon Senior
High School in Jacksonville, Florida, testified that appellant was a "low functioning" but
"model student" who was willing "to do something about his deficiency." Thorpe
remembered that appellant was outgoing and participated in extra-curricular activities. 
According to Thorpe, appellant could communicate well and spoke up for his rights. Linda
Kittles taught appellant special-education world-history classes during high school. Kittles
testified that appellant did not focus on academics, that his ranking in the class was "average
to below average," and that in her opinion, appellant was properly placed in special-education. According to Kittles, appellant had a bit of a temper and was easily distracted
but could be reasoned with. Kittles recalled that appellant was clean-cut and attractive, took
pride in his appearance, was very active in the band, and was considered one of the "cool
kids" in the school. Kittles testified that appellant could make good conversation until
there was something he did not know about, and then he would stop talking. It was not until
appellant was in the classroom that his mental disability became apparent.

 Appellant testified that following high school, he attended Tallahassee Community
College in Tallahassee, Florida, where he took some basic classes in math, English, and
social science. Appellant's mother testified that appellant lived in an apartment with a
roommate within walking distance of campus. Through an agreement between the
community college and Florida A&M University, appellant played the drums and marched
with Florida A&M's highly regarded marching band and took a music class at A&M. 
According to testimony from several witnesses, performing with the marching band
required determination, talent, practice, and timing. Appellant's sister, Lynette Hunter,
testified that she traveled to Tallahassee to watch appellant march with the band during
home football games, but that she never saw him studying when she visited. Although
appellant reported that he had twenty-four hours of college credit, Garnett testified that
appellant never actually completed any courses.

 Appellant was administered another IQ test by Dr. Floyd Jennings (2) in 2004. 
Appellant achieved a verbal IQ score of 72, a performance IQ score of 80, and a full scale
IQ score of 74. Garnett testified that the scores on both IQ tests administered to appellant
fall within the range of subaverage intellectual functioning, despite the full scale score on
the second being above 70, which is considered the "cutoff point." Garnett explained that
because appellant's first test resulted in a full scale IQ score of 64 and the most recent
resulted in a full scale score of 74, "roughly you look at where those ranges would overlap"
and that would "give you a pretty good idea of where that true score would be."

 Garnett also testified that appellant has significant limitations in adaptive behavior. 
Garnett pointed out that appellant had problems dealing with money and did not budget or
know how to file taxes. Appellant could not explain to Garnett a release that he had signed
for a job, or why he had filled out his W-4 form the way he had. Appellant also could not
interpret a passage from the Bible. Garnett asked appellant to explain the following excerpt
from a legal opinion:

 Respondent paralegee filed this action for damages in equitable relief
alleging that Tennessee in a number of its counties that denied them physical
access to the State's courts in violation of Title 2 of the American
Disabilities Act which provides no qualified individual with a disability shall,
by reason of such disability, be excluded from participation or denied the
benefits of the services, programs or activities of a public entity. (3)


Appellant was not able to do so, even though he told Garnett that he liked reading legal
materials. Appellant was able to explain a newspaper section that was written at the fifth- or
sixth-grade level, but was not able to look up a word or read from an encyclopedia. 

 Garnett testified that when he attempted to engage appellant in a conversation
regarding the war in Iraq, appellant's answers were very superficial and displayed a "lack of
really understanding at an in-depth level." Garnett testified that when he asked appellant if
he knew what was going on in Iraq, appellant responded that he thought they were fighting,
and in response to further questioning, he told Garnett that he had "heard they're fighting
about oil." Garnett then asked appellant, "What do you think about that?" and "What do you
really think that's going on over there?" Appellant responded, "Well, I just hope the troops
come home soon" and "Well, it's a pretty difficult thing." On cross-examination, Garnett
admitted that appellant had also told him that Iraq is in the Middle East near Iran and Syria
and that Saddam Hussein had an illegal government.

 Garnett explained that appellant wears a "cloak of competence" that masks his
deficits in intellectual functioning and adaptive behavior. To illustrate his point, Garnett
related how appellant denied ever having been in special-education classes. Appellant also
told Garnett that he had learned about computers in prison, but he actually had taken only a
basic keyboarding class. When appellant told Garnett that he would "fix things at home," it
was no more than tightening a loose doorknob. Appellant also said that he could cook, but
Garnett related that appellant's "cooking" was only chopping vegetables and pouring the
contents of a can into a pot. However, on cross-examination, Garnett did admit that
appellant was able to explain to him the process of frying chicken.

 Because his work history shows that he held twenty-seven different jobs between
1989 and 2004, Garnett characterized apellant as an itinerant worker who lacked regular
attendance. Garnett additionally testified that appellant lacked leadership qualities and had
no close circle of friends, but did have "many" marriages or relationships with women,
which Garnett described as indicating low adaptive functioning. According to Garnett, the
actual crime did not appear to be planned but evolved quickly and impulsively. 

 Garnett testified that appellant had an IQ that falls within the range of subaverage
intellectual functioning, limitations in several areas of adaptive behavior, and evident signs
of mental retardation before the age of 18. Garnett concluded that appellant is mentally
retarded.

 The State presented expert witness Dr. George Carl Denkowski, a clinical
psychologist who reviewed appellant's records and personally evaluated him. Denkowski
did not administer an IQ test to appellant because appellant had recently taken an IQ test
and, more importantly, because appellant refused to undergo any further IQ testing. 
Interpreting the results from appellant's 2004 IQ test, Denkowski explained that, according
to the testing manual, the band of confidence for this test is "four below and five above,"
meaning that appellant's IQ score could range from 70 to 79.

 Denkowski tested appellant's depression and anxiety levels using the Beck
Depression Inventory and the Beck Anxiety Inventory. Appellant's scores indicate that he
was "mildly depressed." Denkowski explained that depression affects an individual's IQ
score and that "even mild depression can lower it by two or three points." Denkowski
believed that appellant's full scale IQ score is actually higher than 74, particularly after
taking into account that appellant was handcuffed during the testing, which hampered his
performance. Denkowski testified that he also believed that the score artificially
understated appellant's mental functioning, in part because the test included questions that
are relevant only to school and not to daily life. When questioned regarding the
discrepancy in scores between appellant's two IQ tests, Denkowski explained that the test
administered in third grade showed an uneven pattern of knowledge acquisition. Denkowski
pointed out that the school psychologist who administered the test noted that appellant's
"ability to articulate knowledge of appropriate social behavior is average" and that the
"scale score analysis suggests poor academic orientation." Denkowski further explained
that the test administered to appellant penalizes people who have not achieved well
academically and that when the academic functions are removed from the scoring, the
result is a better measure of how a person is able to function in the community.

 Denkowski tested appellant's adaptive behavior in 2004 by having appellant rate
himself using the Adaptive Behavior Assessment System. Appellant achieved an adaptive
score of 94 with a score range of 91 to 97. Appellant scored lowest in the communication
area, which Denkowski explained measures "social kinds of aspect of communication like,
for example, if he comes up to you, really starts talking about something of interest to you
or just blurts out whatever is on his mind, will he allow you to talk or will he dominate the
conversation, will he talk over you." Denkowski testified that, even with a low score in the
communication area, appellant had "a normal ability to meet the ordinary demand of
everyday life." Denkowski concluded that appellant was not mentally retarded.

 Yvette Baker, who dated appellant during high school, worked with him at
McDonald's, and had a child with him, testified that she did not know that appellant was in
special-education. Lashon Davis also dated appellant during high school and had three
children with him. She testified that she had no trouble conversing with appellant and was
not aware that he was in special-education classes. Appellant's aunt, Beatrice Mayhew,
testified that despite seeing appellant often while he was growing up and considering him as
her own son, she never knew that he was enrolled in special-education courses. Carla Hull,
appellant's former neighbor, testified that she knew appellant was in special-education
classes, but never knew why. She did not think there was anything wrong with appellant
mentally, and she was able to converse with him.

 Carl Deal was appellant's general foreman at Vanguard Plastics, a company that
manufactures plastic grocery bags and retail bags for large chains. Deal testified that
appellant fully filled out a three-page application and a medical questionnaire prior to being
hired at Vanguard. Appellant's job duties included monitoring the extrusion of plastic film
for the proper thickness, width, and color. Deal explained that the process of maintaining
the proper dimensions and color of the film required that appellant take measurements of
the film, perform calculations based on a mathematical formula, and then adjust the
machinery accordingly. Calculations and adjustments were made on an average of twenty
times a shift. Deal also testified that the company sent appellant to a school to become
certified as a forklift-operator, which required a written test. Appellant passed the test and
received his forklift-operator certification. According to Deal, appellant caused no
problems on the job and had no troubles fulfilling his duties.

 In summary, this case involves expert opinions and evidence both in favor of and
against a finding of mental retardation. Appellant's IQ was scored below 70 before the age
of 18 and above 70 at the age of 33. Denkowski theorized that appellant's uneven
acquisition of knowledge served to artificially lower his IQ score in third grade. Appellant
attended special-education classes in school and had an average or below- average class
ranking. He excelled in marching band, which required a great deal of concentration and
timing to perform complicated maneuvers. One high-school teacher described appellant as
a good conversationalist, provided that he was discussing a subject about which he was
knowledgeable, while another high-school teacher described appellant as "low functioning." 
Members of appellant's family, as well as women with whom he had close relationships, did
not even know appellant was in special-education classes and did not have any trouble
communicating with appellant. The evidence showed that appellant held several jobs,
passed a written test to become a certified forklift-operator, and took measurements and
did mathematical calculations for his job at Vanguard Plastics. The jury was ultimately in
the best position to make credibility determinations and evaluate this conflicting evidence. 
Briseno, 135 S.W.3d at 9; Hall v. State, 160 S.W.3d 24, 40 (Tex. Crim. App. 2004), cert.
denied, 545 U.S. 1141 (2005). 

 The evidence was sufficient to support the jury's determination that appellant failed
to prove mental retardation. The judgment was not so against the great weight and
preponderance of the evidence so as to be manifestly unjust. Meraz, 785 S.W.2d at 155. 
Point of error one is overruled.

B. Pretrial Determination of Mental Retardation

 In point of error two, appellant claims that he was entitled to a pretrial determination
of mental retardation by the judge or a jury separate from that determining guilt. As
discussed above, the Texas Legislature has not established a statutory scheme for the
presentation and determination of an issue of mental retardation in a capital murder trial. 
However, in the meantime, this Court has formulated temporary judicial guidelines in
addressing Atkins claims. Briseno, 135 S.W.3d at 5. The guidelines formulated in Briseno
do not address when the determination of mental retardation is to be made. However, a jury
determination of mental retardation is not required. See Schriro, 546 U.S. at 7 (holding
that the Ninth Circuit erred in commanding Arizona courts to conduct a jury trial to resolve
mental-retardation claim); see also Briseno, 135 S.W.3d at 9 (holding that Atkins does not
require a jury determination of mental retardation in a post-conviction proceeding). In the
absence of legislation or a constitutional requirement directing when the determination of
mental retardation is to be made or by whom, the trial court committed no error in denying
appellant a pretrial determination of mental retardation by a judge or jury separate from that
determining guilt. Point of error two is overruled.

THE DEFINITION OF SOCIETY

 In point of error three, appellant complains that the trial court failed to provide a
definition of "society" within the future-dangerousness special issue. Appellant argues that
the trial court should have instructed the jury that the term "society," as used in the context
of the special issue in this trial, means prison society for the next forty years, after which
parole is a possibility. This Court has repeatedly stated that terms such as "society" require
no special definition, and appellant has provided us with no reason to revisit the issue here.
Blue v. State, 125 S.W.3d 491, 504-05 (Tex. Crim. App. 2003); Earhart v. State, 877
S.W.2d 759, 767 (Tex. Crim. App. 1994). Point of error three is overruled.

FUTURE DANGEROUSNESS

 In his fifth point of error, appellant challenges the factual sufficiency of the
evidence supporting the jury's determination regarding future dangerousness. See Art.
37.071 § 2(b)(1). This Court has consistently declined to conduct a factual-sufficiency
review in this context, and appellant's arguments do not persuade us to retreat from these
holdings. Renteria v. State, 206 S.W.3d 689, 707 (Tex. Crim. App. 2006); Russeau v.
State, 171 S.W.3d 871, 878 n. 1 (Tex. Crim. App. 2005), cert. denied, 126 S. Ct. 2982
(2006). Point of error five is overruled.

 In his fourth point of error, appellant challenges the legal sufficiency of the
evidence supporting the jury's determination regarding the future-dangerousness issue. A
jury may consider a variety of factors when determining whether a defendant will pose a
continuing threat to society. See Wardrip v. State, 56 S.W.3d 588, 594 (Tex. Crim. App.
2001); see also Keeton v. State, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987). We must
view all of the evidence in the light most favorable to the jury's finding and determine
whether, based on that evidence and reasonable inferences therefrom, a rational jury could
have found beyond a reasonable doubt that the answer to the future-dangerousness issue was
"yes." Ladd v. State, 3 S.W.3d 547, 557-58 (Tex. Crim. App. 1999).

 Appellant urges this Court to examine the issue of his future dangerousness in the
context of a prison environment because he will spend at least forty years in prison. 
According to appellant's expert risk-assessment witness, Mary Alice Conroy, appellant is
not a continuing threat in prison because appellant has not been violent during previous
periods of incarceration and his past violent acts have been committed only in free society. 
In Bible v. State, 162 S.W.3d 234 (Tex. Crim. App. 2005), however, we rejected a similar
claim, explaining that "[g]ood behavior in prison does not preclude a finding of future
dangerousness. All that is required is that the evidence be sufficient for a rational trier of
fact to conclude beyond a reasonable doubt that there is a probability the defendant would
commit criminal acts of violence that would constitute a continuing threat to society." Id.
at 245.

 The record in this case shows that appellant has a long history of violent offenses. 
Beginning in the late 1980s and throughout the early 1990s, appellant was abusive toward
Lashon Smith, the mother of three of his children. He hit her on the head, face, chest, and
stomach, even when she was pregnant. Appellant once knocked Smith unconscious when he
threw her against a wall. Another time, appellant beat Smith during an argument and fired
two shots as she ran away from him. Appellant pursued Smith, and when he caught her, he
dragged her down the street by her hair. Appellant also beat his wife, Everlyn, causing her
to call the police at least twelve times. Everlyn testified that appellant threatened her at
different times with a hammer, a knife, and a gun, and that he fired a semi-automatic pistol
while children were present.

 Appellant attempted to rape his neighbor, Carla Hull, in February 1990. In
December 1994, he was involved in an armed robbery at a Wendy's, during which a female
employee was held at gunpoint, hit several times, and threatened with death. Appellant and
another man committed a home invasion in January 1995. Appellant placed a gun to Shenita
Meyers' head and forced her to leave the house with his accomplice to get money while he
remained there alone with Meyers' five-year-old daughter. In January 1999, appellant
entered Ho Long's home in Florida, placed a gun to his head, and stole his car. Several days
later, appellant's wife, Everlyn, was stopped by police while driving Long's car in Houston. 
This led to appellant's arrest soon thereafter. A revolver was found in his possession, and
he was subsequently charged and convicted of unlawful possession of a firearm. In July
2003, appellant again stole a car at gunpoint, this time from Tulia Jarrett, an elderly woman,
in Cincinnati, Ohio. Jarrett's stolen car was recovered by police a month later in Houston
with appellant's wallet and mail inside.

 On September 2, 2003, appellant entered the office of the Ambassador North
Apartments in Houston and demanded money from Sandra Sanchez and Curtis Everett at
gunpoint. On September 15, 2003, appellant committed a robbery at a Taco Bell and fired
five shots at employee Jerall Mims, who escaped harm. As appellant fled, he crossed
through a backyard located directly behind the Taco Bell. When confronted by the
resident's father, appellant shot him in the chest.

 On October 23, 2003, appellant committed a robbery at a Kentucky Fried Chicken
and shot employee Elijah Mitchell in the stomach. On October 25, 2003, appellant shot
Jung Choi while robbing him at Beauty Max, the offense for which he was convicted in this
case. On November 7, 2003, appellant fired six shots at Danny Patel at the Crystal Inn
when Patel investigated a sudden blackout at the Inn. On November 10, 2003, appellant
committed a robbery at the Ori Sub Sandwich Shop and shot employee To Duong in the leg. 
Two days later, while committing a robbery at a Stop-N-Shop convenience store, appellant
pistol whipped and shot Nguyen Tan Lu, killing her.

 In summary, Appellant has shot five people, killing two of them, and he has assaulted
numerous others. There was sufficient evidence presented from which a rational jury could
conclude that appellant posed a future danger to society. Point of error four is overruled.

EXTRANEOUS-OFFENSE INSTRUCTION

 In the sixth point of error, appellant complains that the trial court erred in declining
to instruct the jury at punishment that they could consider evidence of appellant's
extraneous offenses only if they found beyond a reasonable doubt that he committed those
offenses. This Court has previously held that there is no error in not having a burden of
proof instruction concerning extraneous offenses as long as the punishment charge
properly requires the State to prove the special issues, other than mitigation and affirmative
defenses, beyond a reasonable doubt. Garcia v. State, 57 S.W.3d 436, 442 (Tex. Crim.
App. 2001); see also Gallo, 2007 Tex. Crim. App. LEXIS 1234 at *26. The jury charge at
punishment in this case correctly required the State to prove the non-mitigation special
issues beyond a reasonable doubt. Accordingly, point of error six is overruled.

CONSTITUTIONALITY OF THE TEXAS

DEATH-PENALTY SCHEME In point of error seven, appellant argues that the Texas death-penalty scheme is
unconstitutional as applied to him because, in light of the single aggravating future
dangerousness factor, it was weighted toward an arbitrary sentence of death since the jury
had no discretion to assess a sentence of life without parole. This Court has previously
considered and rejected this claim, and appellant has given us no reason to reconsider it
here. Arnold v. State, 873 S.W.2d 27, 39-40 (Tex. Crim. App. 1993). Point of error seven
is overruled.

 We affirm the judgment of the trial court.


 Meyers, J.



Delivered: November 7, 2007


Publish
1. Unless otherwise indicated all references to Articles refer to the Code of Criminal Procedure.
2. The record before this Court does not indicate whether Dr. Jennings tested appellant on
behalf of the defense or the State, or whether Dr. Jennings conducted the testing as a neutral court-appointed expert.
3. This Court has determined that the excerpt, which was read aloud by Garnett during
punishment proceedings, is from the syllabus of Tennessee v. Lane, 541 U.S. 509 (2004). The actual
text of the syllabus reads:


 Respondent paraplegics filed this action for damages and equitable relief, alleging that
Tennessee and a number of its counties had denied them physical access to that State's
courts in violation of Title II of the Americans with Disabilities Act of 1990 (ADA),
which provides: "[N]o qualified individual with a disability shall, by reason of such
disability, be excluded from participation or denied the benefits of the services,
programs or activities of a public entity."


It is impossible, from the record before this Court, to know which version appellant was asked to
explain.