**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 21, 2009

Charles R. Fulbruge III
Clerk

No. 05-70038

ERIC LYNN MOORE

Petitioner-Appellee

v.

NATHANIEL QUARTERMAN, DIRECTOR, TEXAS DEPARTMENT OF
CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION

Respondent-Appellant

Appeal from the United States District Court
for the Eastern District of Texas
No. 6:03-CV-224

Before SMITH, GARZA, and DENNIS, Circuit Judges.

PER CURIAM:[*]

The state's appeal of the district court's grant of Eric Lynn Moore's petition for writ of habeas corpus was returned to this panel from the en banc court. We affirm.

I

Moore was convicted and sentenced to death for the murder of Helen Ayers in 1991. The Texas Court of Criminal Appeals ("TCCA") affirmed Moore's

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

conviction and death sentence in 1994, and rejected Moore's first habeas petition. The federal district court denied Moore's habeas petition and this Court affirmed in 2002. *See Moore v. Cockrell*, No. 01-41489, 54 F. App'x. 591 (5th Cir. 2002).

In 2002, the United States Supreme Court decided *Atkins v. Virginia*, 536 U.S. 304, holding that the execution of a mentally retarded inmate violates the Eighth Amendment. Moore filed a second state habeas petition with the TCCA, claiming that he was mentally retarded and thus ineligible for the death penalty under *Atkins*. The TCCA denied Moore's claim. *Ex Parte Moore*, No. 38,670-02 (Tex. Crim. App 2003). Moore then filed a federal habeas petition, again making his *Atkins* claim. This Court authorized him to file a successive §2254 petition. *In re Moore*, No. 03-40207, 67 F. App'x. 252 (5th Cir. May 12, 2003). Further procedural activity ensued in this Court and in the district court, eventually resulting in Moore being granted an evidentiary hearing by the district court. After considering the evidence, the district court found Moore to be mentally retarded and enjoined the State from executing him.

The State appealed the district court's ruling. This panel reversed the ruling on procedural grounds. *Moore v. Quarterman,* 454 F.3d 484 (5th Cir. 2006). Moore petitioned for rehearing *en banc*, and the panel withdrew its opinion, replacing it with a second opinion that also reversed the district court on procedural grounds. *Moore v. Quarterman*, 491 F.3d 213 (5th Cir. 2007) Moore filed a second petition for rehearing *en banc*, which was granted. The *en banc* Court reversed the panel, finding that Moore had established cause and prejudice for failure to exhaust his *Atkins* claim in state court. The case was returned to the panel for review of the district court's determination on the merits of Moore's *Atkins* claim. *Moore v. Quarterman*, 533 F.3d 338, 342 ("We return this case to the panel for review of the ultimate *Atkins* determination of mental retardation under the clear error standard.")

II

To succeed on an *Atkins* claim, a defendant must prove by a preponderance of the evidence that he is mentally retarded. *Lewis v. Quarterman*, 541 F.3d 280, 283 (2008). We review a district court's findings of fact for clear error and its conclusions of law *de novo*. 28 U.S.C. § 2254(d); *e.g. Lewis*, 541 F.3d at 283. The question of whether a defendant suffers from mental retardation is a question of fact, and thus subject to clear error review. *See Clark v. Quarterman*, 457 F.3d 441, 444 (5th Cir. 2006).

Factual findings are clearly erroneous only if they are implausible in light of the record as a whole. *Rivera v. Quarterman*, 505 F.3d 349, 360 (5th Cir. 2007). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573-74 (1985) (citing *United States v. Yellow Cab Co.*, 338 U.S. 338, 342 (1949)). A reviewing court accords deference to determinations of credibility made by the factfinder; this deference also extends to findings based on "physical or documentary evidence or inferences from other facts." *Id*. at 574.

III

The district court conducted its assessment of the facts under the framework developed by the Texas Criminal Court of Appeals in *Ex Parte Briseno*, 135 S.W.3d 1 (Tex. Ct. Crim. App. 2004), which provides the guidelines for determining mental retardation for the purposes of *Atkins* claims.[1] Under

---

[1] The Texas legislature has yet to enact legislation for determining mental retardation under *Atkins*. *See, e.g. Neel v. State*, 256 S.W.3d 264, 270 (Tex. Ct. Crim. App. 2008) ("Over four years later [following *Briseno*], the Texas legislature still has not enacted any legislation

*Briseno*, a capital defendant must prove by the preponderance of the evidence that he is mentally retarded. This burden of proof applies to three showings: (1) the defendant had significant subaverage intellectual functioning, (2) with related limits in adaptive functioning, and (3) the onset of which occurred prior to the defendant turning eighteen. This "three-pronged test" is an adaptation of the definition of mental retardation provided by the American Association for Mental Retardation (AAMR) and set out in section 591.003(13) of the Texas Health and Safety Code. *Briseno*, 135 S.W.3d at 7. The district court focused the bulk of its analysis on intellectual and adaptive functioning.[2]

A

Significantly subaverage intellectual functioning is defined as an IQ of about 70 or below (approximately 2 standard deviations below the mean). *Briseno*, 135 S.W.3d at 7 n.24 (citing to AMERICAN PSYCHIATRIC ASSOCIATION DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (Text Revision, 4th ed. 2000) (hereinafter "DSM-IV"); AMERICAN ASSOCIATION ON MENTAL DEFICIENCY, CLASSIFICATION IN MENTAL RETARDATION N1 (Grossman ed.1983)(hereinafter "AAMD")). IQ tests may overstate or understate the subject's actual level of intellectual functioning. *See, id.*, 135 S.W.3d at 8 ("Psychologists and other mental health professionals are flexible in their assessment of mental retardation; thus, sometimes a person whose IQ has tested above 70 may be diagnosed as mentally retarded while a person whose IQ tests below 70 may not be mentally retarded.").

_____

on this matter.")

[2] The state does not argue that the district court erred in finding that Moore fulfilled the third criterion of the *Briseno* test: manifestation of significantly subaverage intellectual functioning and related adaptive deficits before the age of eighteen. *See Moore v. Dretke*,2005 WL 1606437,*15 (E.D.Tex. July 1, 2005).

The standard instrument for measuring intellectual functioning is the Wechsler Adult Intelligence Scales test (WAIS III). *Atkins*, 536 U.S. at 309 n.5. Moore presented the results of two Wechsler-based IQ tests before the district court. His scores were, respectively, 76 (on a Wechsler Adult Intelligent Scale-Revised, or WAIS-R, test, ) and 66 (on the WAIS III test). He also presented the results of a 1973 Primary Mental Abilities (PMA) Test that was administered by his school; the result was 74. The most recent test, the WAIS III, was conducted in conjunction with a test of non-verbal abilities (TONI-2), which reduces the impact of the test taker's educational background on his score. Moore's expert, Dr. Antonin Llorente ("Dr. Llorente"), testified that the TONI-2 results placed him in the bottom eight-tenths percentile of the entire population.

The district court based its holding that Moore had proved by preponderance of the evidence that he exhibited significant subaverage intellectual functioning on two facts: First, the court found that the State's expert, Dr. Gary Mears ("Dr. Mears"), agreed under cross-examination that Moore satisfied the intellectual functioning prong of the *Briseno* test; second, the court averaged the three IQ test scores, for a score of 72, and applied a five-point standard error of measurement. The district court found that the result satisfied the AAMR criterion of subaverage intellectual functioning. The State argues that both findings were clearly erroneous because (1) its expert did not "concede" that Moore satisfied the intellectual functioning prong; and (2) all three of the test scores are so unreliable as to be invalid.

The district court relied on the following exchange between Moore's lawyer and Dr. Mears, in reference to the intellectual functioning prong of the *Briseno* test:

> Q: So you agree with Dr. Llorente that whether we use the DSM[-IV] definition or the AAMR definition, the first prong is satisfied in your professional opinion?

A: The prong in terms of—I have some questions about his accuracy of score, but I would still, nevertheless, because of my opinion about the adaptive functioning, I will accept that.

Q: You do accept that?

A: I will accept it.

Q: Because I don't want to spend half a day talking about it?

A: Right. I will accept it—regardless of the scoring errors, I still will accept it.

The discussion then moved on to the adaptive functioning prong of the *Briseno* test.

Though the State contends that this exchange does not constitute a "concession" by Dr. Mears that Moore satisfies the intellectual functioning prong, we find that it is at best ambiguous and defer to the district court's view of the testimony. It is clear that Dr. Mears did not consider Moore to be mentally retarded because (in his assessment) the strength of Moore's adaptive functioning outweighed any limitations in intellectual functioning. However, it is also a reasonable interpretation of Dr. Mears' testimony that he believed Moore to have significant limitations in intellectual functioning based solely on his IQ test scores.

The dissent characterizes Dr. Mears' prior testimony about the IQ tests as breaking dramatically with his later agreement that Moore satisfied the intellectual functioning prong. On the contrary, the report submitted by Dr. Mears one day before he testified, which the dissent references, clearly states, "I accepted the results of the administration, testing, and scoring of the intelligence testing done by both Drs. Llorente and Fulbright. Psychometrically, the scores are rather consistent considering a more than a decade lag." Though Dr. Mears discusses the IQ tests at length in his testimony, he never states that any scoring error in the administration of the WAIS-III renders it so unreliable or inaccurate such that it could not be used to determine intellectual functioning.

Rather, he maintains reservations about potential scoring errors (though he does not state that the test should be thrown out altogether) and disagrees about the degree to which reliance on the scores alone, without analysis of adaptive functioning, can be the basis for making an overall determination of mental retardation. Dr. Mears' views on Moore's adaptive functioning, and his overall view that Moore is not mentally retarded, is not incompatible with agreement that Moore's intellectual functioning as measured by the IQ tests satisfies *Briseno*. The point is that the district court's interpretation of the exchange, in light of the other documentary and evidentiary testimony, was reasonable. We are not left with the "definite and firm conviction that a mistake was committed." *Anderson*, 470 U.S. at 574-75.

The State argues next that the unreliability of all three test scores nullifies any basis upon which to base the intellectual functioning finding. The State also points to evidence it says indicates that Moore deliberately scored poorly on the WAIS-III test.

While there was conflicting testimony as to the presence of scoring errors on all three tests, the district court had a clear basis in the record to find that the scores were consistent after accounting for their margins of error, and were thus collectively a sufficiently reliable indicator of Moore's IQ. For example, Dr. Mears stated at the hearing that he did not administer his own independent test because he "had sufficient number of tests of the quantify intelligence tests [sic] to at least get a view of how [Moore] compares with the people that take those tests." Dr. Llorente testified that "we are not trying to reach here a conclusion about a patient's intellectual level on the basis of one test alone. That is not the right thing to do, and I agree with Dr. Mears on that. So it should be on the basis of multiple, for example procedures, which is what we did." In averaging the test scores and relying on the five-point margin of error that Dr. Llorente

testified was applicable to each score, the district court attempted to find a way to reconcile all three test scores.[3]

The district court also heard expert testimony that supported the averaging of the three scores and the application of the confidence interval. Dr. Llorente extensively testified as to each of the testing protocols and noted that, despite potential scoring errors and various other considerations, all three tests demonstrated consistency in their findings; he also testified that a five point margin of error was applicable to each test score. Relying on the AAMR definition and how the AAMR accounts for the standard error of measurement, Dr. Llorente testified that a score of "75 and below would be considered mental retardation." In the expert report he submitted to the district court, Dr. Mears also noted that the AAMR associates mild mental retardation with IQs ranging from 50 to 75.[4]

Thus, there were several bases to support the district court's finding that Moore satisfied the intellectual functioning prong of the *Briseno* test: the existence of the WAIS III score below 70; Dr. Llorente's testimony that the other two adjusted test scores were consistent with the WAIS III score considering the standard errors of measurement; and Dr. Llorente's testimony that a score of 75

---

[3] The district court could have relied solely on Dr. Llorente's testimony and concluded that Moore demonstrated significant subaverage intellectual functioning, especially as it expressly found Dr. Llorente's testimony to be more credible than Dr. Mears as to all three *Briseno* criteria, given the greater comprehensiveness of Dr. Llorente's examination. *Moore*, 2005 WL 1606437 at *13.

[4] Dr. Mears never addressed in his testimony whether a score of 75 or below was compatible with a finding of mental retardation. As previously discussed, Dr. Mears testified that IQ test scores alone, without consideration of educational and cultural factors, could not be used to determine whether an individual was mentally retarded.

or less constitutes mental retardation.[5] Based on this evidence, we find no clear error.

Finally, the district court also rejected the evidence proffered by the State of "malingering" by Moore. *See id.* ("Moore's scores on [ ] tests [other than the PMA] showed no response bias, which is an attempt by Moore to perform poorly.") .

---

[5] Judge Smith would hold that, under Texas law, there is a bright-line IQ score cutoff of 70 and apply it in this case. Notwithstanding the fact that the State never made this argument before the Court, and thus we found no reason to address it, we note that neither *Briseno* nor its progeny establish that such a bright-line cutoff exists. The TCCA decisions which apply the *Briseno* criteria do not change the standard outlined in *Briseno*, which defined significantly subaverage functioning as occurring in persons with an "IQ of *about* 70 or below (approximately 2 standard deviations below the mean)." 135 S.W.3d at 7 n.24 (citing to DSM-IV and AMERICAN ASSOCIATION ON MENTAL DEFICIENCY, CLASSIFICATION IN MENTAL RETARDATION N1 (AAMD)) (emphasis added). The *Briseno* court declined to create any presumption that mental retardation must be established by IQ scores lower than 70. *See Briseno*, 135 S.W.3d at 7 n.24 (declining to adopt Ohio's rebuttable presumption that a defendant is not mentally retarded if his or her IQ is above 70). *Briseno* did not alter the standards outlined in *Atkins*, which states that mental retardation can be found in range of 70-75. 536 U.S. at 309 ("It is estimated that between 1 and 3 percent of the population has an IQ between 70 and 75 or lower, which is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition.") TCCA cases are not in conflict with *Briseno* or *Atkins*. *See e.g. Ex parte Modden*, 147 S.W.3d 293, 298 (Tex. Crim. App. 2004) ("the applicant's IQ scores of 58 and 64 are well below the 70-75 score that generally indicates subaverage general intellectual functioning."). *Briseno* makes clear the accounting for the standard error of measurement is an inquiry conducted by the factfinder based on expert testimony. *See Briseno*, 135 S.W.3d at 7 n.24 (recognizing that "[p]sychologists and other mental health professionals are flexible in their assessment of mental retardation" and that a person tested with an IQ above 70 may be mentally retarded); *id.* at 14 n. 53 (discussing expert disagreement as to application of the confidence interval and ultimately rejecting application due to lack of evidence in the record).

The criticism that the majority fails to take the opportunity to "make sense of Texas's jurisprudence regarding retardation. . . and to provide guidance" is misplaced. First, the ultimate responsibility for providing guidance and clarifying the relevant standards, especially to the degree that such "clarification" actually calls into question the language articulated in *Atkins* and in *Briseno*, rests with the Texas courts, not with us. *See Atkins*, 536 U.S. at 317 ("[W]e leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.") (internal citations omitted). Second, we are reluctant to create new law in this area where the parties fail to identify or address these novel issues.

We therefore find that, because the record supports the district court's assessment of Moore's intellectual functioning, the district court did not clearly err in holding that Moore satisfies that prong of the *Briseno* test.

B

The district court spent the bulk of its opinion discussing evidence under the adaptive functioning prong of the *Briseno* test. Under this prong, the factfinder looks for "significant limitations in an individual's effectiveness in meeting the standards of maturation, learning, personal independence, and/or social responsibility that are expected for his or her age level and cultural group, as determined by clinical assessment and, usually, standardized scales." *Briseno*, 135 S.W.3d at 7 n.25 (citing AMERICAN ASSOCIATION ON MENTAL DEFICIENCY (AAMD), CLASSIFICATION IN MENTAL RETARDATION 11).

In arguing that the district court clearly erred in its evaluation of the adaptive functioning evidence, the State primarily argues that the "great weight" of the evidence cuts the other way, and that the district court abused its discretion in how it conducted its factfinding. Again, however, we must be mindful of the deferential lens through which we view the lower court's credibility determinations and conflicting testimony and evidence. The district court relied exclusively on the AAMR's guidelines for determining mental retardation, and followed the AAMR in examination of three areas: Moore's conceptual skills, Moore's social skills, and Moore's practical skills.[6] *Moore*, 2005

---

[6] The criticism that the district court erred as a matter of law in "inconsistently" applying the AAMR 9th and 10th editions was never made by the State, likely because no rule on AAMR editions exists in either Texas or the 5th Circuit. *Briseno* itself cites both the AAMR 9th and AAMR 10th almost interchangeably, 135 S.W.3d. at 7-8, as Judge Smith acknowledges. The court in *Briseno* also does not cite either the AAMR 9th or the AAMR 10th for a definition of limitations in adaptive functioning, instead citing the American Association on Mental (AAMD) definition. *Id.* at 7 n. 25 (citing AAMD at 11). This definition, while similar, is not the same as either the AAMR 9th or the AAMR 10th. Further, this Court has never distinguished between the AAMR 9th and the AAMR 10th.

Given the absence of any briefing by the parties on this issue, we decline to create a

WL 1606437 at *5. The district court considered "experts' clinical judgments and other evidence to determine whether Moore [had] significant deficits that place him approximately two standard deviations below the mean in adaptive functioning." *Id.* at 6. As part of assessing the "clinical judgment" of the experts, the court looked to their training, experience with others who are mentally retarded, and familiarity with the individual and his environment. *Id.* The court also found Dr. Llorente's testimony to be more credible than Dr. Mears, especially with respect to evaluation of adaptive functioning, based on the fact that Dr. Llorente spent a great deal more time than Dr. Mears evaluating Moore and interviewing people who knew him:

> On all three criteria, but especially Moore's adaptive functioning, the Court finds Dr. Llorente's testimony and assessment more credible than Dr. Mears's. Dr. Llorente spent seven to eight hours interviewing and evaluating Moore, while Dr. Mears spent only two to two and half hours. Dr. Llorente contacted and interviewed Moore's family members to learn about Moore's childhood, while Dr. Mears did not contact or interview anyone because he thought their opinions were not useful. Instead, Dr. Mears relied exclusively on his comparatively brief interview with Moore and his review of Moore's records. Dr. Llorente administered a large battery of tests to Moore. Dr. Mears also performed some tests on Moore, but not nearly as many.

*Id.* at 13.

We first address the State's contention that the district court abused its discretion in not considering "other factors" suggested in *Briseno* to help the factfinder distinguish mental retardation from antisocial personality disorder. These factors are: (1) whether those who knew the person best during the developmental stage thought he was mentally retarded at the time, and if so,

---

new mandatory methodology in applying the AAMR. Adoption of such a rule would again contravene *Atkins'* mandate to leave the development of standards for weighing mental retardation to the states. *Atkins*, 536 U.S. at 317.

acted according to that determination; (2) whether the person formulated plans and carried them through; (3) whether the person's conduct showed leadership; (4) whether the person's conduct in response to external stimuli is rational and appropriate, regardless of whether it is socially acceptable; (5) whether the person responds coherently, rationally, and on point to oral or written questions; (6) whether the person hides facts or lies effectively in his own or others' interests; (7) whether the commission of the offense required forethought, planning, and complex execution of purpose. *Briseno*, 135 S.W.3d at 8. The district court declined to apply these factors for the following reasons: it found that the State did not argue or present evidence that Moore had an antisocial personality disorder that accounted for his adaptive functioning deficiencies; that, even if the argument that Moore suffered from antisocial personality disorder had been raised, there was no evidence to support a finding that such a disorder caused Moore's cognitive and adaptive deficits; that the factors are not part of the AAMR's definition of mental retardation; and that application of the factors is purely discretionary. *Moore*, 2005 WL 1606437 at 5 n.6.

The district court did not abuse its discretion in not explicitly considering the *Briseno* factors, as it found that the State did not present evidence to support a finding that a personality disorder is responsible for Moore's cognitive and adaptive deficits. *Id.* Though the State does point to testimony provided by its experts that Moore displayed symptoms of antisocial personality disorder, we must defer to the district court's determination that any such symptoms did not *cause* his subaverage intellectual and limited adaptive functioning.[7]

---

[7] Further, *Briseno* makes clear that the application of the factors is discretionary. *Briseno*, 135 S.W.3d at 8 ("There are, however, some other evidentiary factors which factfinders in the criminal trial context *might also focus upon* in weighing evidence as indicative of mental retardation or of a personality disorder. . .") (emphasis added). Subsequent TCCA cases do not alter this discretionary language. *See Hunter v. State*, 243 S.W.3d 664, 666 ( Tex. Crim. App.2007) ("Other evidentiary factors that fact finders in the criminal-trial context *might also focus upon* in weighing evidence as indicative of mental

12

Notwithstanding the district court's statement that it would not consider the *Briseno* factors, the transcript of the evidentiary hearing indicates that the court did consider evidence implicating the factors, including the factor that is of particular importance to the State—Moore's role in the crime for which he was convicted. The *district court* specifically asked Dr. Llorente whether his evaluation of Moore's mental retardation would be changed by evidence that Moore was the leader of the crime, and Dr. Llorente responded that it would not. Moore's counsel then followed up by pointing out that in the 1991 assessment of Moore, the report stated that Moore was more likely a follower than a leader, and Dr. Llorente agreed that Moore's mental capacity is such that he would be easily manipulated and influenced by others. Though this discussion is absent in the district court's memorandum opinion, it is clear from the transcript of the hearing that the court considered it.

Evidence pertaining to the other *Briseno* factors also appears throughout the evidentiary hearing. In the hundreds of pages of testimony, the district judge heard: opinions from people who knew Moore during his developmental stage about whether they thought he was mentally retarded; evidence about Moore's functioning at school and at work showing his planning skills and response to external stimuli; and evidence about how he responds to oral and written questions. For example, the district court looked at evidence from Moore's school records, and heard from numerous witnesses including teachers, family members, classmates and acquaintances regarding his inability to complete schoolwork and perform other basic tasks until the age of eighteen.

---

retardation include. . . "); *Gallo v. State*, 239 S.W.3d 757, 769-70 (Tex. Crim. App. 2007) (same) (emphasis added); *Ex Parte Modden*, 147 S.W.3d 293, 296 (Tex. Crim. App. 2004) ("In *Ex parte Briseno*, we concluded that the criteria in these definitions are subjective, and thus, we set out some additional factors that factfinders *may use*."); *Rosales v. Quarterman*, 291 F.App'x 558, 562 (5th Cir. 2008) (per curiam) (("In *Briseno*, the TCCA also laid out a number of guidelines that courts *can consider* when making mental retardation determinations.") (emphasis added).

The district court also heard testimony that Moore was unable to properly dress himself, could not tie his shoes, consistently scored well below his grade level, and had difficulties learning to speak in sentences and paragraphs, as well as testimony that Moore had difficulties performing basic assignments, and was a follower who was easily tricked as a child. *Moore*, 2005 WL 1606437 at *7-*10. The district court also heard from former co-workers and employers as to deficits in his ability to complete work-related tasks. *Id.* at *11. In addition to testimony and documentary evidence regarding Moore's school and work performance, the district court considered Dr. Llorente's and Dr. Mears' examinations of Moore, which included both oral and written evaluations. *Id.* at *13.

The district court relied on this evidence for its finding that Moore's deficits in adaptive functioning satisfy *Briseno*. The State argues that the district court incorrectly viewed the evidence, arguing, for example, that substantial evidence showed that Moore's academic performance would have improved if he applied himself, that Moore's teachers did not remember his inability to tie his shoes, that he was employed at several jobs and was commended for good performance, and that he communicated and interacted well with his classmates. Where evidence conflicts, however, we must defer to the fact-finder's decision as to which evidence to credit, and we may not simply re-weigh the facts to come to a contrary conclusion. *Anderson*, 470 U.S. at 574. The State also argues that a determination of mental retardation for the purposes of *Atkins* cannot rest on such subjective factors. However, the *Briseno* court acknowledged that the adaptive behavior criteria are indeed "exceedingly subjective," *Briseno*, 135 S.W.3d at 8, and we are bound to apply the law as set out by the Texas courts.

IV

In arguing that the district court clearly erred, the State essentially re-litigates the evidentiary case it presented below. However, the district court was in a better position than this court to judge the credibility of the witnesses who testified on the extent, duration, and causes of Moore's intellectual and adaptive functioning limitations. *See Rivera*, 505 F.3d at 363. Because its findings were not "implausible," they "survive[ ] clear error review." *Id.* Accordingly, we AFFIRM.

JERRY E. SMITH, Circuit Judge, dissenting:


I respectfully dissent. The majority has produced an intellectually sluggish opinion, electing to sweep the district court's legal (and factual) errors under the proverbial rug rather than undertake its responsibility to make sense of Texas's jurisprudence regarding retardation, to apply it rigorously to Eric Moore's case, and to provide guidance. Haphazardly-applied standards of review, casually-read caselaw, and superficially-scrutinized evidence make for an unfortunate combination; here, they result in shallow analysis and the wrong result. The only mitigation is that the majority opinion is unpublished, so it is not binding on anyone or any court.


## I. Legal Background.

### A. Standard of Review.

The majority's errors run deep, beginning with its exaggeratedly deferential standard of review. Moore was required to show, by a preponderance of the evidence, that he satisfied the test for retardation established by *Ex parte Briseño*, 135 S.W.3d 1, 12 (Tex. Crim. App. 2004), and its progeny.[1] But though the district court acts as the finder of fact on the overall question of mental retardation,[2] and though we review its factual findings for clear error,[3] we apply a *de novo* review of *legal* questions as a necessary means of determining whether the ultimate *factual* question of retardation was decided without reversible error.

The majority fails to acknowledge it, but there is no doubt on that score:

---

[1] *Clark v. Quarterman*, 457 F.3d 441, 444 (5th Cir. 2006) (Dennis, J.); *see also Morris v. Dretke*, 413 F.3d 484, 497 (5th Cir. 2005).

[2] *Clark*, 457 F.3d at 444.

[3] *Rivera v. Quarterman*, 505 F.3d 349, 361 (5th Cir. 2007).

To the extent that errors of state or federal law "influence" the district court's decision, even that court's findings of fact are accorded *no deference whatsoever*.[4] "[A] judgment based on a factual finding derived from an incorrect understanding of substantive law must be reversed,"[5] because incorrect legal conclusions "taint" resulting factual findings.[6] The clearly-erroneous standard of review gives no shelter to a district court's legal errors.

Similarly, the district court cannot immunize its findings from reversal merely by characterizing them as determinations of credibility. *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985).[7] Nor is the existence of *some* evidence to support the district court's finding sufficient to rule out a determination of clear error entirely. *Id.* at 573.

## B. The *Briseño* Test.

After the Supreme Court decided *Atkins v. Virginia*, 536 U.S. 304 (2002), leaving the details of substantive and procedural protections for mentally re-

---

[4] *G.M. Trading Corp. v. Comm'r*, 121 F.3d 977, 980 (5th Cir. 1997). Nor is the panel permitted to defer to the district court in its interpretation of Texas's definition of mental retardation. *See Hulin v. Fibreboard Corp.*, 178 F.3d 316, 318 (5th Cir. 1999) (Dennis, J.) (citing *Salve Regina Coll. v. Russell*, 499 U.S. 225, 231 (1991) ("We conclude that a court of appeals should review *de novo* a district court's determination of state law."))

[5] *Mobil Exploration & Producing U.S., Inc. v. Cajun Constr. Servs., Inc.*, 45 F.3d 96, 99 (5th Cir. 1995).

[6] *Id.* at 99 n.6 (quoting *Fulton Nat'l Bank v. Tate*, 363 F.2d 562, 567 (5th Cir. 1966)).

[7] The *Anderson* Court explained,

> Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it. Where such factors are present, the court of appeals may well find clear error even in a finding purportedly based on a credibility determination.

*Anderson*, 470 U.S. at 575.

tarded convicts to the states, the Texas Court of Criminal Appeals ("TCCA") adopted the general diagnostic framework of the American Association on Mental Retardation ("AAMR")[8] that is employed elsewhere in Texas state law. *Briseño*, 135 S.W.3d at 7. The Texas Legislature has taken no action pursuant to *Briseño*,[9] and Texas courts have continued to apply it. The AAMR definition is therefore authoritative, at least to the extent that it was incorporated by the *Briseño* court, and subject to any modifications that *Briseño* requires.[10]

The *Briseño* definition of retardation has three parts that the defendant has the burden of proving by a preponderance of the evidence. *Id.* at 12. First, *Briseño* requires that putatively retarded individuals have "'significantly subaverage' general intellectual functioning," "defined as an IQ of about 70 or below (approximately two standard deviations below the mean)."[11] In practice, IQ tests typically are normed to an average IQ defined as 100, with a standard deviation of 15 or 16. AAMR 10th at 60-66 (discussing various IQ tests). Retarded persons are those with IQ's two standard deviations or more below the mean, that is, in the bottom 2-3% of the population as measured by IQ testing.

Second, *Briseño* requires that low IQ be "accompanied by related limitations in adaptive functioning." *Briseño*, 135 S.W.3d at 7 & n.25 (internal quotation marks omitted). "Impairments in adaptive behavior are defined as signifi-

---

[8] *See* AAMR, MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORT (10th ed. 2002) ("AAMR 10th").

[9] *Neal v. State*, 256 S.W.3d 264, 270 (Tex. Crim. App. 2008) ("Over four years later, the Texas legislature still has not enacted any legislation on this matter."), *cert. denied*, 129 S. Ct. 1037 (2009).

[10] *See Briseño*, 135 S.W.3d at 9 & n.30 (noting that the legal definition of retardation is different from, though informed by, "psychological diagnostic criteria").

[11] *Id.* at 7 & n.24 (quoting American Psychiatric Association, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 39 (Text Revision, 4th ed. 2000) ("DSM-IV")). *See also* AAMR 10th at 35, 57 (discussing the AAMR 10th threshold IQ score for retardation).

cant limitations in an individual's effectiveness in meeting the standards of maturation, learning, personal independence, and/or social responsibility that are expected for his or her age level and cultural group, as determined by clinical assessment and, usually, standardized scales."[12]  Third, the defendant's poor IQ and adaptive functioning deficits must have manifested themselves before the age of eighteen.[13]

## III.  Intellectual Functioning.

The district court concluded that Moore satisfied the first prong of the *Briseño* test by demonstrating an IQ of "about 70" or lower.[14]  The court explained that it had two bases for that finding: first, what the court took to be the state's expert's agreement with Moore that Moore's IQ is impaired for purposes of *Briseño*, and second, Moore's history of IQ testing.[15]  The court, contrary to the majority's analysis, committed reversible error on both counts.

---

[12] *Briseño*, 135 S.W. 3d at 7 n.25 (quoting American Association on Mental Deficiency, CLASSIFICATION IN MENTAL RETARDATION (Grossman ed. 1983)).  *See also* AAMR 10th at 41 (defining "adaptive skills" as those abilities "that have been learned by people in order to function in their everyday lives").

[13] *See Briseño*, 135 S.W.3d at 7; AAMR 10th at 1.

[14] *Moore v. Dretke*, No. 603-CV-224, 2005 WL 1606437, at *5 (E.D. Tex. Jul. 1, 2005) (citing AAMR, MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORT (9th ed. 1992) ("AAMR 9th")).

[15] The court stated, in full,

With a five-point standard error of measurement and both experts agreeing that Moore satisfies this criterion for mental retardation, the Court concludes that Moore has proven by a preponderance of the evidence that he satisfies the AAMR criterion of subaverage intellectual functioning defined as an IQ of "about 70 or below."

*Moore v. Dretke*, 2005 WL 1606437, at *5.

A. Dr. Mears's "Agreement."

Moore submitted the expert testimony of Dr. Anatolin Llorente, who administered an IQ test to Moore and testified that Moore's IQ is below the *Briseño* threshold of 70. The state's expert, Dr. Gary Mears, stated on direct examination that, on account of various scoring errors in, and necessary adjustments to, Moore's IQ test scores, his IQ is significantly higher than 70, perhaps even over 80, and in any case not in the retarded range. 3 EH 239.[16] Even before Mears identified flaws in Llorente's testing procedure, he argued in his report that because Llorente's test did not take "cultural factors and educational factors" into account, it critically understated Moore's actual IQ and contributed to Llorente's misdiagnosis.[17] Mears's conclusions, if adopted by the district court, would have precluded a finding of retardation.

The colloquy that opened Mears's cross-examination, however, has proven a source of confusion for both the district court and the majority. The panel does not quote the entire relevant dialogue, so I will:

> Q. Let's start with IQ testing.
>
> A. Yes, sir.
>
> Q. Can we agree for the purposes of this hearing that Mr. Moore has significant limitations in intellectual functioning, the first prong of the mental retardation definition? That is my question.
>
> A. I agree that he has limitations in intellectual functioning, yes.
>
> Q. Now, do you agree to the extent we can move past that first prong of the mental retardation definition and focus on adaptive deficits?

---

[16] I cite the evidentiary hearing transcript in the form "[volume] EH [page]."

[17] Mears was not able to administer an IQ test himself, because Llorente had given one only three months before, 3 EH 216, and a six-month interval is needed for accuracy. *Hall v. State*, 160 S.W.3d 24, 30 n.14 (Tex. Crim. App. 2004).

A. Yes, sir.

Q. So you agree with Dr. Llorente that whether we use the DSM definition or the AAMR definition, the first prong is satisfied in your professional opinion?

A. The prong in terms of––I have some question [sic] about his accuracy of the score, but I would still, nevertheless, because of my opinion about the adaptive functioning, I will accept that.

Q. You do accept that?

A. I will accept it.

Q. Because I don't want to spend half a day talking about it?

A. Right, I will accept it––regardless of the scoring errors. I still will accept it.

Q. Okay.

[Moore's Attorney]. Your Honor, I hate to rest on that, but I think I need to. I think we have moved past that prong.

THE COURT. All right. Proceed.

Q. I appreciate that, sir.

A. Thank you.

Q. You have helped us move along. . . .

4 EH 3-4. The district court took this exchange as a concession by Mears and concluded that "both experts agree[d] that Moore satisfies" the *Briseño* IQ criterion. *Moore v. Dretke*, 2005 WL 1606437, at *5. The majority characterizes the testimony as "at best ambiguous" and defers to the district court's view.

That is absurd; only one interpretation of Mears's testimony is defensible, and it is not the district court's or the majority's. It makes no sense to suppose

that Mears (1) submitted a report asserting that Moore had an IQ well in excess of the ceiling for a retardation diagnosis and attacking the accuracy of Llorente's contrary evidence, (2) testified to that effect at great length on one day of a hearing (even bringing up additional concerns with Llorente's evidence), and (3) then for no apparent reason conceded the issue entirely in the opening moments of his cross-examination, first thing the very next morning. That, however, is exactly what the district court and the majority say.

Neither Moore, nor the district court, nor the majority has posited an explanation for such a dramatic reversal. Nor can I imagine an explanation that survives a moment of sober reflection on the actual course of the district court proceedings. After eliminating rationalizations too fanciful even for Moore to suggest in his own defense (but which, somehow, satisfy the district court and the majority), what remains is only the conclusion that Mears made no concession at all.

A broader review of the record only bolsters that view. On direct examination, immediately after explaining his objections to the IQ test administered by Llorente, Mears emphasized that even if, hypothetically, Llorente's IQ testing were accepted as accurate, he was "so convinced" that Moore's adaptive functioning far exceeded the level of mentally retarded persons that whether Llorente's IQ testing was adopted would not matter. 3 EH 220.[18] Though the majority chooses to ignore it, that is almost precisely the view Mears repeated to Moore's counsel on cross-examination. Mears's testimony was consistent between direct

---

[18] The majority lamely counters that on direct examination Mears "never clearly states that the scores [qualifying Moore on the IQ prong] are invalid." That is not only irrelevant, but a flat misrepresentation of what happened at the hearing. The state did not need to show that Llorente's test was "invalid," only that it was inaccurate or unreliable, and that is exactly the opinion Mears presented. Relying on Mears's failure use the word "invalid" in describing Llorente's test when he actually *did* testify that it was incorrectly administered and subject to a variety of upward adjustments is no way for the majority to treat a transcript that, read sensibly, provides no support for its opinion.

and cross examination; there was no concession.

Plainly, Mears wished to present two independent bases for rejecting Moore's *Atkins* claim: Because Mears felt that the adaptive-functioning prong was not even a close call in Moore's case, it did not matter what the court decided on the IQ issue, so Mears did not, in the words of Moore's counsel, "want to spend half a day talking about it." Mears reserved his objections to Moore's IQ scores, but all parties preferred to focus on Mears's subsequent testimony regarding Moore's adaptive functioning.[19]

This is not a case in which two plausible theories explain the evidence, nor is it a decision concerning a witness's credibility where the panel must accord the district court heightened deference under the clearly-erroneous standard of review. *See Anderson*, 470 U.S. at 574-75. The district court misunderstood the plain words of Mears's testimony. The question is not whether Mears meant what he said, or whether what he said was believable or true; rather, the question is whether he said what he said, and that can be determined by the cold words in the transcript without reference to credibility, inflection, or demeanor.

Notwithstanding the majority's headlong rush to defer to the district court, the "definite and firm conviction that a mistake has been committed" is inescapable. *Id*. at 573. To the extent the court relied on Mears's "agreement" in making its finding on Moore's IQ, that decision "is implausible in the light of the record considered as a whole," *Rivera*, 505 F.3d at 361, and the court committed clear error. That disposes of one of the district court's two bases for finding that Moore's IQ satisfies the requirements of *Briseño*.

---

[19] The majority, in effect, penalizes the state because its expert cooperated with the court—to the evident gratitude of Moore's counsel—in expediting the hearing by avoiding what the parties perceived as unnecessary discussion.

## B. Moore's IQ.

### 1. Criteria.

The present panel's next job, in a correct treatment of Moore's case, would have been to identify the Texas state standard for deciding whether Moore's IQ meets the requirements for retardation under *Atkins*. The basic question is whether Texas law treats the IQ of 70 spoken of in *Briseño* and AAMR 10th as a bright-line cutoff point. The majority studiously avoids thinking about that question. But it is impossible to evaluate the district court's finding that Moore's IQ is below the borderline set by *Briseño* without first determining what that borderline *is*, especially considering that the court's factual findings would not be entitled to deference if the standard it applied were wrong. I will therefore fill that hole in the majority's analysis.

The TCCA has left no doubt that an IQ below 70 (or at or below 70) is required for a finding of retardation under *Atkins*.[20] In our post-*Briseño* decisions, this court has interpreted the Texas standard in the same way as the TCCA.[21]

---

[20] *See, e.g.*, *Williams v. State*, 270 S.W.3d 112, 132 (Tex. Crim. App. 2008) (distinguishing between the defendant's "70 and below IQ scores" and his "70 and above IQ scores"); *Hunter v. State*, 243 S.W.3d 664, 669-71 (Tex. Crim. App. 2007) (noting defense expert's testimony that 70 "is considered the 'cutoff point'"), *cert. denied*, 129 S. Ct. 51 (2008); *Howard v. State*, 153 S.W.3d 382, 386 (Tex. Crim. App. 2004) ("'Significantly subaverage general intellectual functioning' is defined as an IQ of 70 or below."); *see also Neal*, 256 S.W.3d at 272-73 ("significant sub-average general intellectual functioning, usually evidenced by an IQ score below 70"); *Ex parte Blue*, 230 S.W.3d 151, 163 (Tex. Crim. App. 2007) (same). The fact that Texas courts have referred to 70 as a "presumptively retarded score," *see, e.g.*, *Ex parte Taylor*, No. WR-48498-02, 2006 WL 234854, at *3 (Tex. Crim. App. 2006) (per curiam) (unpublished) (Johnson, J. concurring), supports this interpretation.

I acknowledge an otherwise-unsupported statement in *Ex parte Modden*, 147 S.W.3d 293, 298 (Tex. Crim. App. 2004), that a "70-75 score" "generally indicates subaverage general intellectual functioning." That assertion, however, not only is *dictum*—considering that the defendant's IQ had been measured, in two tests, at 58 and 64—but also is contrary to the overwhelming weight of TCCA authority; the statement, to my knowledge, has not been repeated in any later decision.

[21] *See Taylor v. Quarterman*, 498 F.3d 306, 308 (5th Cir. 2007) ("[T]he only IQ test tak-
(continued...)

In no case has a Texas court or the Fifth Circuit found mental retardation for *Atkins* purposes where its best guess as to IQ was above 70.

To be sure, IQ tests have a margin of error, and a person's *actual* IQ may be below 70 even when an IQ test yields a higher score. Both the *Briseño* court and AAMR 10th speak of an IQ measurement in terms of probabilities and acknowledge that, considering the five-point margin of error typical in IQ tests, a diagnosis of retardation is sometimes possible even where a person's IQ is measured to be above 70. *See Briseño*, 135 S.W.3d at 7 n.24; AAMR 10th at 57.

Texas caselaw is explicit, though, in holding that an actual IQ between 70 and 75 is not sufficient for a finding of retardation.[22] The *Briseño* petitioner presented scores of 72 and 74 and pointed out that, because of the margin of error, his true IQ could be lower. The TCCA rejected that argument: "[E]ven if a factfinder applied the statistical standard deviation, there is not enough evidence in this record that proves, by a preponderance of evidence, that applicant's true IQ is lower than 72-74 rather than higher than 72-74." *Briseño*, 135 S.W.3d at 14 n.53. If the *Briseño* court had meant to establish an IQ cutoff above 70, or not to establish a cutoff at all, or if it had envisioned simple application of an IQ

---

[21] (...continued)
en of Taylor prior to his turning eighteen yielded a result of 75, above the mild retardation cut off of 70."), *cert. denied*, 128 S. Ct. 1739 (2008); *Woods v. Quarterman*, 493 F.3d 580, 586 (5th Cir. 2007) ("[T]he court noted . . . the existence of four IQ test scores placing Woods above the seventy-point cutoff."); *In re Mathis*, 483 F.3d 395, 397 (5th Cir. 2007) ("Typically, a person's IQ must be measured at 70 or below to qualify as mentally retarded."); *Clark*, 457 F.3d at 445 (stating that IQ of 70 is "the rough cut-off for mental retardation"); *In re Salazar*, 443 F.3d 430, 433 n.1 (5th Cir. 2006) (per curiam) (treating 70 as the "cutoff score" even where an IQ score could have been "adjusted" to below 75). *See also Wilson v. Quarterman*, No. 6:06-CV-140, 2009 WL 900807, at *5 (E.D. Tex. Mar. 31, 2009) (quoting Texas state trial court findings stating that 70 is "considered the border below which a person is mildly mentally retarded").

[22] *See Neal*, 256 S.W.3d at 273-75 (deferring to jury's finding of no preponderance based on test scores of 70, 72, and 87); *Taylor*, 2006 WL 234854, at *6 (Johnson, J., concurring) (no preponderance based on score of 75); *Ex parte Rodriguez*, 164 S.W.3d 400, 403, 405 (Tex. Crim. App. 2005) (Cochran, J., concurring) (score of 71, according to defense expert, "not in the retarded range"; 70 a "cut-off level").

test's margin of error to the resulting score, it would have had no reason to make this observation; the scores of 72 and 74 would likely have been satisfactory by themselves as a matter of law. The *Briseño* court also expressly questioned the diagnostic usefulness of any margin of error where "the burden of proof is preponderance of the evidence, not a 95% confidence burden." *Briseño*, 135 S.W.3d at 14 n.53.[23]

The most accurate interpretation of Texas law, then, is that the lodestar of the *Briseño* analysis, as reflected in *Briseño* and its progeny, is an IQ of 70 or below (or, in accordance with some of the cited cases, an IQ below 70), *regardless* of the margin of error. Although IQ *tests* certainly have a margin of error, recognition of that margin merely permits evidence that a defendant's *true* IQ is lower or higher than what was measured.[24] Evidence may show that an IQ measure-

---

[23] That makes excellent statistical sense. By definition, even taking the margin of error into account, an average IQ score above 70 cannot by itself prove an IQ of 70 or below by a preponderance of the evidence, for when the center of a confidence interval is higher than 70, the probability that the score is below 70 cannot be above 50 percent. The probability that a subject's true IQ lies above 70 is necessarily above 50 percent; in the absence of other data, that precludes finding an IQ below 70.

[24] *See Briseño*, 135 S.W.3d at 14 n.53; *see also Hunter*, 243 S.W.3d at 669-70; *Taylor*, 498 F.3d at 308 ("The administrator of the test thought Taylor was capable of performing better than 75. While Taylor's expert concluded that this test result overstated Taylor's IQ by seven points, the trial court was not unreasonable in finding otherwise."). In *Briseño*, the trial court determined that the most accurate measurements of IQ yielded results of 72 and 74. The TCCA quoted and adopted the trial court's finding that "[t]he preponderance of the evidence does not show that these test scores over-state the actual intellectual functioning of Applicant; the evidence in fact showed that there are good indications that the test scores understated Applicant's intellectual functioning." *Briseño*, 135 S.W.3d at 14.

The decision in *Briseño* therefore reflects a combination of (1) skepticism toward any given IQ measurement and (2) searching for a true IQ measurement at (or maybe below) the threshold of 70. This is consistent with the treatment in AAMR 10th, at 57-59, of variations in IQ measurements and fully explains why some Texas courts, *see, e.g.*, *Neal*, 256 S.W.3d at 272-73, state that an IQ score below 70 "usually" satisfies the IQ prong. One way or another, evidentiary flexibility in determining whether a standard is met is not to be confused with the absence of any standard at all. *See Clark*, 457 F.3d at 446 (explaining that Texas courts "make a flexible determination" of whether a defendant's IQ is above or below 70).

ment between 70 and 75 is inflated, thus permitting a finding of "significantly subaverage general intellectual functioning," just as the opposite may be shown regarding an IQ measured below 70, *Briseño*, 135 S.W.3d at 7 n.24, and courts should be "flexible" in considering such evidence.[25]  But without such evidence, an IQ score above 70 is not itself indicative of retardation "merely because the low end of [a defendant's] confidence band [is] below 70."  *Clark*, 457 F.3d at 446.[26]

Not only is the TCCA's directive on this matter plain, but this court has adopted it.  In *Clark*, the panel reasoned that "[t]he explanation provided by the [TCCA] in adopting its definition of mental retardation plainly foreclose[d]" the petitioner's claim "that it was error for the state court [not] to find mental retardation where the lowest potential score in the confidence band of the 1983 [IQ] test was below 70."  *Clark*, 457 F.3d at 446 (citing *Briseño*, 135 S.W.3d at

---

[25] *See Clark*, 457 F.3d at 444-46.  *See also Williams v. Quarterman*, 293 F. App'x 298, 309-10 (5th Cir. 2008) (per curiam) (finding an IQ above 70 where petitioner had tested at 70 or 71 repeatedly, and the district court suspected malingering); *In re Hearn*, 418 F.3d 444, 447 & n.4 (5th Cir. 2005) (considering measurement error in granting permission to file a successive habeas petition based on IQ of 74).

[26] One district judge from the court *a quo* has presented a compelling justification for a bright-line rule.

> Even though IQ testing and evaluation of adaptive limitations involves ranges, the professional organizations and the courts have adopted standards or criteria, which establish a cut-off point.  No matter which criteria are chosen, there will be some individuals who are very close to the border of the cutoff—even if only slightly higher.  Saying that a Defendant should be classified as mentally retarded simply because he or she is "borderline" would make the cutoff, which is already based on an evaluation of ranges, impossibly vague.  There will always be a Defendant who is close to, but just above, the level of the last person found to be mentally retarded who could therefore be termed "borderline."  That Defendant would then be in a new "borderline" sub-category of the classification of mentally retarded.  The concept of "borderline" would swallow any definition or standard.

*Simpson v. Quarterman*, No. 1:04-CV-485, 2009 WL 80091, at *15 (E.D. Tex. Jan. 8, 2009).

7 n.24).

Moore was therefore required to prove that his IQ is below a bright-line cutoff of 70. Such a finding could be made *in spite* of, but not *because* of, IQ measurements above 70.

## 2. Moore's IQ Scores.

Once the proper standard has been identified, the obvious next issue is whether the district court applied it correctly. Because the majority chooses not to identify that standard, it is unable to do anything much beyond shrugging its shoulders and babbling about clear error. The inescapable answer, however, is No, for reasons of both fact and law.

Moore's IQ has been measured three times. When he was in first grade, his school administered a PMA test that showed his IQ to be 74. In 1991, the prison gave a WAIS-R test that yielded a score of 76. Lastly, Llorente administered a WAIS-III test in 2004 that produced a score of 66.[27]

All three of those test results were called into question at the evidentiary hearing. The PMA score, for example, is only a number; there is no evidence that it was properly scored or whether it was administered individually, as the test protocol requires, or to an entire school class. 3 EH 41-45. The vocabulary section of the WAIS-R, according to Llorente, was improperly scored, and in a way that may have slightly inflated the score.[28] Llorente also testified concern

---

[27] The majority notes that Llorente also administered a TONI-2 test that showed an IQ of 60, but even Llorente seems not to have considered that test to be a measure of general intelligence. His conclusion reflects the standard professional view of the TONI-2. *See, e.g., Hall v. Quarterman*, 534 F.3d 365, 376 (5th Cir. 2008). In any event, though the district court mentioned that score, it did not rely on it. *See Moore v. Dretke*, 2005 WL 1606437, at *4-*5.

[28] The WAIS-R verbal section includes a series of progressively more difficult vocabulary questions. Test subjects are asked to define the fourth word in a list, with full credit assumed on the first three. But if the subject receives no credit on any one of questions

(continued...)

ing the "Flynn Effect," the apparent increase in the average IQ scores in populations over time, as measured by a given IQ test. Because the WAIS-R was an older test when it was administered to Moore, Llorente suggested adjusting Moore's score of 76 downward by about four points. 2 EH 175-78.[29]

Mears urged adjusting Moore's score on the WAIS-R upward by as much as ten points to take Moore's lack of education into account. 3 EH 239. Mears also stated that the decline in Moore's measured IQ between the WAIS-R and the WAIS-III could be accounted for by Moore's age, observing that though Moore's verbal score stayed essentially constant, a decrease in his math score (in which abilities naturally decline with age) drove his second score down. 3 EH 246-49. Llorente made no attempt to correct for Moore's age or educational level, despite the fact that Moore is well outside the demographic group to which the WAIS-III is normally applied. 3 EH 68-71, 228-30.

Mears also noted an error in Llorente's scoring methodology. Llorente, it appears, administered vocabulary questions to Moore until Moore missed a total

---

[28] (...continued)
4 through 8, the administrator is required to ask and score questions 1 through 3. Petitioner Exhibit ("Pet. Ex.") 13. Moore received no credit on question 7, "fabric" (he evidently answered "clothes"), but the administrator did not score questions 1 through 3, "bed," "ship," and "penny," to confirm that Moore knew the words. Respondent Exhibit ("Res. Ex.") 7 at 33; 2 EH 171-74. This may have inflated the score, perhaps by "one or two points." 2 EH 174. Moore answered "ship" and "penny" correctly on the WAIS-III test that Llorente administered in 2004, but Llorente said one cannot assume that Moore would have known the terms in 1991. 3 EH 52-55.

[29] The Flynn Effect "has not been accepted in this Circuit as scientifically valid." *Mathis*, 483 F.3d at 398 n.1 (citing *Salazar*, 443 F.3d at 433 n.1). More importantly for our purposes, it is not evident whether Texas courts would permit consideration of the Flynn Effect. *Neal*, 256 S.W.3d at 273 ("We have previously refrained from applying the Flynn Effect, noting that it is an 'unexamined scientific concept' that does not provide a reliable basis for concluding that an appellant has significant sub-average general intellectual functioning.") (quoting *Blue,* 230 S.W.3d at 166 ("This Court has never specifically addressed the scientific validity of the Flynn Effect. Nor will we attempt to do so now.")). Even if both of Llorente's adjustments to the WAIS-R were adopted, the test would still yield a measurement of 72, above the Texas threshold.

of six. According to Mears, however, the WAIS-III requires the administrator to ask questions until the subject misses six consecutive questions, and Moore had missed only four in a row when Llorente stopped. In effect, Llorente administered a partial test; we cannot know what would have happened to Moore's score if Llorente had asked the next two questions. 3 EH 216-18.

Instead of grappling with those conflicting upward and downward adjustments, the district court gave the three scores equal weight, averaged them, reached an IQ of 72, applied the "five-point standard error of measurement," and therefore concluded that Moore had borne his burden of proof. It is that finding, and the district court's actual reasoning in making it, that the panel must consider, and yet the majority refuses to address it at anything resembling an acceptable level of detail.

### 3. Errors.

To begin with, the district court's IQ decision is not insulated by an evaluation of credibility. The court stated, in the context of its findings on Moore's adaptive functioning, that it found Llorente more credible than Mears "[o]n all three criteria, but especially on Moore's adaptive functioning[.]" *Moore v. Dretke*, 2005 WL 1606437, at *13.[30] In explaining its credibility finding, the court made no mention of the experts' IQ-related testimony but instead pointed to other aspects of their evaluation of Moore.

That finding, additionally, had no apparent effect on the district court's reasoning with regard to Moore's IQ. By averaging the IQ scores, the court declined to give additional weight to the test administered by Llorente. The court

---

[30] It is puzzling that the court could find one expert more credible than the other on the third element—onset before age eighteen—because both parties and, as the district court noted, *Moore v. Dretke*, 2005 WL 1606437, at *15, both experts agreed that that element of the retardation test was met. Apparently the district court was intent on painting with a broad brush the fact that it liked Llorente's testimony better than Mears's.

did not evaluate the upward and downward adjustments proposed by either expert and, in effect, treated them as a wash; it certainly did not say that it gave Llorente's proposed adjustments any more credence than Mears's.[31] Though the district court certainly could have relied entirely on Llorente's testimony and concluded that Moore's IQ is 66, it chose not to. The court decided that Moore satisfied the IQ prong of its analysis not because it preferred Llorente's testimony to Mears's but because it mistakenly believed the experts to be in agreement. This panel therefore, in evaluating Moore's IQ, need not give the court's decision on this matter the special degree of deference that we accord findings involving credibility. *Anderson*, 470 U.S. at 575.

The district court's conclusion cannot survive a substantive review less slavishly deferential than the majority's. For one thing, there is no legal or record support for taking an average of Moore's IQ scores. Averaging IQ scores is, to say the least, a creative approach to their analysis and comparison and is highly unusual. Neither expert suggested, employed, or endorsed it.[32] The district court assumed, without any evident backing, that averaging is a meaningful way to compare scores from different IQ testing protocols administered years apart and that the margin of error was the same for all three and was the same after the averaging as before. All of those assumptions are facially implausible, and the district court had no apparent reason to think any of them is correct.

Nor is there any precedent supporting such a move. When faced with a variety of IQ test results, courts instead (1) identify the single most reliable re-

---

[31] The district court did discount the state's argument that Moore was malingering on the test administered by Llorente, but Mears (contrary to the statement in the court's memorandum opinion) did not express that view himself, so that conclusion did not entail a credibility assessment as between the two experts.

[32] The majority's statement to the contrary has no basis in the record. Reading support for averaging IQ scores into Llorente's testimony about the "consistency" of Moore's three IQ scores, as the majority tries to do, merely distorts the hearing testimony transcript with wishful thinking.

sult,[33] (2) narrow the results to a probable IQ range above or below 70,[34] or (3) treat the IQ testing results as a wash that precludes a finding of retardation.[35] All these approaches are preferable to just taking an average, especially considering that all three of the IQ scores are of doubtful reliability.[36] The district court, in effect, made up its psychiatric testing methodologies as it went along, and the majority is compliant.

Granting, though, that the district court's best guess as to Moore's IQ was 72, the district court's finding that Moore satisfied the IQ prong of *Briseño* collapses entirely. If Moore's average IQ of 72 is his true IQ, then as a matter of law he is not retarded for purposes of *Briseño* and *Atkins*. Moreover, the fact that the district court found, based on the IQ evidence described, that Moore demonstrated "an IQ of 'about 70 or below'" suggests that the district court failed to recognize Texas's bright-line cutoff point correctly. As discussed above, Texas requires a finding of an IQ of 70 or below (or perhaps, in accordance with some cases, below 70). The district court committed reversible legal error if it operated on any other understanding of Texas law or reached a conclusion contrary to it.

If, on the other hand, the district court correctly understood the IQ cutoff point, the only way Moore's average IQ could have justified a finding of retardation is if the court relied on extrinsic evidence as to Moore's IQ that would have

---

[33] *See Rivera*, 505 F.3d at 361-62; *Taylor*, 2006 WL 234854, at *6 (Johnson, J., concurring).

[34] *See Briseño*, 135 S.W.3d at 14 & n.53; *see also Clark*, 457 F.3d at 445-46.

[35] *See Blue*, 230 S.W.3d at 165-66 (stating that where the defendant suggests adjusting a "partial" score, above 70, to below 70, "we will simply regard the record as . . . devoid of any reliable IQ score"); *Lewis v. Quarterman*, 541 F.3d 280, 284 (5th Cir. 2008); *see also Howard*, 153 S.W.3d at 387.

[36] Under such circumstances, even Moore's counsel, at oral argument, conceded that the results must be "weighed."

pointed to a lower result, for example, by showing that his scores were inflated or that the higher scores were entitled to less evidentiary weight. *Cf. Rivera*, 505 F.3d at 361-62. But the district court did no such thing. Instead, it seems just to have relied on the fact that IQ tests typically have a five-point margin of error. As explained above, if the court really did drag its best guess as to Moore's IQ score below the 70-point threshold by applying the margin of error —and nothing in its reasoning suggests a more generous reading—it did so contrary not only to Texas law but also to this circuit's precedent.

That makes no difference to the majority, which refers to the district court's "accounting for [the tests'] margins of error" without blinking, and evidently with a straight face. The majority is utterly silent, in fact, on the district court's failure to apply the *Briseño* IQ cutoff point properly. Instead, it makes a last-ditch effort to salvage the district court's decision by relying on the superficially comforting fact that, according to Llorente, Moore's three IQ scores were "consistent."

But the fact that three IQ scores, two above 70 and one below, may be "consistent" tells us nothing about whether Moore's IQ is above or below 70, the question the court was bound to answer. After all, Mears testified that the scores were consistent as well, and the thrust of his testimony was the opposite of Llorente's. The district court was still obligated to determine whether the high or the low end of the resulting range was most accurate, but it did not.[37] The majority is without justification in ignoring that failure.

---

[37] Even if, viewing its words most loosely, it decided that Moore's IQ was at the low end of the confidence interval based on the experts' supposed agreement that Moore had satisfied the first *Briseño* prong, the court's conclusion would still fail, because, as explained above, there was no such agreement.

## C. Summary Regarding IQ.

The district court applied an incorrect standard of law and misinterpreted the factual evidence in stating that Moore meets the IQ prong of the *Briseño* test. If Moore's IQ is above 70, his claim for relief under *Atkins* must fail. While IQ tests have a margin of error, the law compels the district court to determine its *effect*; it makes no difference standing alone. Though the court may have been entitled merely to credit Llorente's testimony and accept the IQ test he administered, it chose not to. The majority seeks to avoid reaching those conclusions by hiding behind the standard of review, but the majority cannot disguise its abdication of its responsibility to judge the district court's findings.

The most charitable remedy for the district court's errors is to remand for that court to hear Moore's evidence again in light of the correct standards. That would require a new evidentiary hearing at which testimony, expert or otherwise, can be given and interpreted under a correct understanding of the law.

Such a forgiving outcome is by no means required, however. The panel is entirely justified in reversing the district court altogether, rendering judgment for the state, and submitting Moore to the punishment duly imposed on him. Moore had the burden all along of showing that he met the IQ prong of the *Briseño* test. Despite ample opportunity to present evidence, he failed to present a single complete IQ score on his own behalf. As I have explained, Llorente appears to have misadministered the WAIS-III in such a way that there is no telling how much higher Moore's score would have been if correctly measured, and Texas courts and this court have repeatedly endorsed a hard denial of relief under such circumstances.[38] For Moore to receive the relief he seeks, on the evi

---

[38] *See Blue*, 230 S.W.3d at 165-66 (stating that where the defendant suggests adjusting a "partial" score, above 70, to below 70, "we will simply regard the record as . . . devoid of any reliable IQ score"); *Lewis v. Quarterman*, 541 F.3d 280, 284 (5th Cir. 2008); *see also Howard*, 153 S.W.3d at 387. *See also Williams*, 293 F. App'x at 311 ("Because Williams carries the bur-
(continued...)

dence he presented, is nothing short of a windfall.

None of the district court's bases for finding in Moore's favor on the first *Briseño* factor withstands scrutiny, nor do any of the majority's justifications for affirming. All that remains is the majority's craven refusal to confront and rectify the errors presented to it.

## IV. Adaptive Functioning.

Even if Moore's IQ were sufficiently low under the *Briseño* test, he still has the burden to show the necessary deficits in adaptive functioning, the issue that (thanks partly to Mears's generous cooperation with Moore's counsel) took up the bulk of the *Atkins* hearing. Besides the respective experts, Moore relied primarily on the testimony of family members and acquaintances from his youth; the state, on Moore's former teachers and prison guards. The court, after helpfully condensing the relevant evidence and testimony into a veritable biography of the petitioner, concluded that Moore suffered from significant deficits in adaptive functioning. Even giving due deference to the court's determinations of fact and credibility, it erred as a matter of law.

## A. Criteria.

Once again, the majority takes no interest in the criteria for reviewing the district court's findings. But just as was the case with the IQ analysis, it is impossible to evaluate the district court's opinion without understanding the adaptive functioning framework. Again, I explicate that standard and demonstrate the district court's serious errors in applying it.

AAMR 10th discusses adaptive behavior in terms of "conceptual, social,

---

[38] (...continued)
den of proving mental retardation, failure to prove the first *Briseño* prong should end our inquiry.").

and practical adaptive skills"[39] and requires that an individual have significant deficits (placing him two standard deviations or more below normal) in at least one of those three categories. AAMR 10th at 73. But as explained in AAMR 10th at 81-82, the previous edition, which is AAMR 9th, employed a much different approach, dividing adaptive functioning into ten categories—communication, functional academics, self-direction, health and safety, social skills, leisure, self-care, home living, community use, and work—and requires significant deficits in two of those categories.

AAMR 9th was current at the time of *Atkins*.[40] AAMR 10th was current at the time of *Briseño*, when the general AAMR framework was incorporated into Texas law.[41] At first glance, then, it might seem most appropriate to require that adaptive functioning be analyzed under the AAMR 10th framework.[42] But the *Briseño* court cited both editions[43] and never specified which adaptive-functioning test to use. In practice, other Texas courts, as well, have often referred to AAMR 9th.[44] This court has typically followed whichever edition was used by

---

[39] AAMR 10th provides examples of "representative skills" within these categories. Under conceptual skills, the AAMR lists "language (receptive and expressive)," "reading and writing," "money concepts," and "self-direction;" under social skills, "interpersonal," "responsibility," "self-esteem," "gullibility (likelihood of being tricked or manipulated)," "naivete," "follows rules," "obeys laws," and "avoids victimization;" under practical skills, "activities of daily living," "instrumental activities of daily living," "occupational skills," and "maintains safe environment." AAMR 10th at 42.

[40] *See Atkins*, 536 U.S. at 308 n.3.

[41] *See Briseño*, 135 S.W.3d at 8 n.29.

[42] *See ex parte Chester*, No. AP-75037, 2007 WL 602607, at *1 & n.9 (Tex. Crim. App. Feb. 28, 2007) (unpublished) (interpreting *Briseño* as requiring "significant deficits in adaptive functioning, usually expressed by limited conceptual, social, and adaptive skills").

[43] *See generally Briseño*, 135 S.W.3d at 7-8.

[44] *See Modden*, 147 S.W.3d at 295-96 & n.9 (quoting and attributing to *Briseño* the AAMR 9th standard).

the parties and experts.[45] So have the district courts in this circuit.[46] That approach is intuitively obvious, for it permits use of two comparably valid frameworks while guaranteeing that district courts will always have the necessary expert guidance in applying them.

In this case, confusingly, AAMR 9th and AAMR 10th were used inconsistently during Moore's hearing. Mears's report, though it never mentions either edition specifically, plainly follows the AAMR 9th standards. The categories of adaptive functioning he lists, and the two-category deficit requirement he mentions, are those of AAMR 9th. Res. Ex. 8 at 3. Mears's direct examination, moreover, was structured around the AAMR 9th categories. 3 EH 250-57.

Llorente's report and testimony are less explicit but inescapably lead to the same conclusion. After opining, in his report, that Moore had difficulties in his general academics and "vocational history," Llorente segued into a discussion of additional fields of adaptive functioning—"social skills," "daily living skills," "other adaptive areas"—with the phrase "[a]s if these two factors were not enough." Not only are these categories essentially those of AAMR 9th, but Llorente's presentation demonstrates that he was looking for deficits in two or more specific areas of adaptive functioning, as AAMR 9th requires, rather than in one of AAMR 10th's broad categories. Pet. Ex. 1 at 11.

Furthermore, when explaining adaptive functioning at the hearing, Llorente mentioned the categories of "social skills, communications, self-care, and those types of skills where an individual requires to be able to disengage his re-

---

[45] *See Williams*, 293 F. App'x, at 311-12 (AAMR 9th); *Rivera*, 505 F.3d at 357 (same); *Woods*, 493 F.3d at 585 (same); *Morris*, 413 F.3d at 487-88 & n.1 (AAMR 10th).

[46] *See Simpson*, 2009 WL 80091, at *12; *Rivera v. Dretke*, No. B-03-139, 2006 WL 870927, at *10 (S.D. Tex. Mar. 31, 2006) ("[T]his Court will utilize the 1992 AAMR criteria [*i.e.*, AAMR 9th] . . . because it is the definition that has been endorsed by prior courts and because it is the definition upon which both sides agree, despite the fact that Petitioner discusses both definitions without advancing one over the other.") (same), *aff'd in part, vacated in part*, 505 F.3d 349 (5th Cir. 2007), *cert. denied*, 129 S. Ct. 176 (2008).

sponsibilities in his society." 2 EH 183. These are categories of the AAMR 9th framework and do not resemble the AAMR 10th's three-part standard. At no time did Llorente specify a limitation in conceptual, social, or practical adaptive functioning; he consistently spoke of multiple, specific areas of adaptive functioning and said that Moore was limited in a variety of them.

Moore, however, argued to the district court that the AAMR 10th standard was applicable, 2 EH 17, and he entered excerpts from AAMR 10th into evidence, Pet. Ex. 7. Moore's counsel, while cross-examining Mears, moved freely between the paradigms of the two editions.[47] The court ultimately used the AAMR 10th three-part framework. For all its detailed reasoning and close examination of the evidence, the court thus failed to make its factual findings consistently with the standards laid out in the expert testimony.

A few examples will demonstrate how far adrift that failure led the district court. Though AAMR 10th gives some indication of how its standard relates to AAMR 9th's categories and provides "representative skills" relevant to conceptual, social, and practical adaptive functioning, *see* AAMR 10th at 82 Table 5.2, its guidance is hardly self-explanatory. Llorente's report, at its most definite point, finds that Moore has deficits in academics, social skills, vocational history, and daily living skills.

"Functional academics," though, is only one of four AAMR 9th categories that the AAMR 10th table connects to conceptual adaptive skills, and it has no obvious counterpart among the AAMR 10th representative skills. "Social skills" is one of two AAMR 9th categories related to social adaptive skills, but there is no indication whether AAMR 10th and AAMR 9th use the terms identically.

---

[47] 4 EH 44-47 (questioning Mears on Moore's "self-esteem," "gullibility," obedience to law, "ability to avoid victimization," and "occupational skills," all listed in AAMR 10th as "skills" relevant to social adaptive functioning); 4 EH 52-56 (questioning Mears on Moore's "academic functioning"); 4 EH 60 ("I have got before you . . . the three broad categories from the AAMR. I am going to start and look at conceptual.").

"Activities of daily living" is a representative skill area within practical adaptive skills in AAMR 10th (an area in which the court did not find significant limitations), but "self care," "home living," and "work" are three of the five AAMR 9th categories grouped under that new rubric. AAMR 10th gives no indication as to how deficits in AAMR 9th areas translate to the three-category framework.

At the same time, when the court considered the AAMR 10th representative skills (e.g., money concepts, obeying laws, avoiding victimization)—categories not mentioned in AAMR 9th—it did so essentially blind, not having heard experts explain those examples or how they fit into the all-embracing fields of adaptive functioning. One might put this still more starkly: No expert testified in support of the district court's finding that Moore exhibits significant deficits in conceptual and social adaptive skills.

That is error that infects all the district court's factual findings concerning adaptive functioning. Consider, for example, the court's extensive treatment of Moore's academic history, a subject much discussed by both experts. Those data, under AAMR 9th, might plausibly be pigeonholed under "functional academics," as Llorente did in his report. But the nearest equivalent in AAMR 10th is "conceptual skills," a category including such representative skills as "language" and "reading and writing." AAMR 10th gives no indication—and the experts had no occasion to explain—how Moore's grades in math, history, and science (for example) relate to his adaptive functioning under the framework the court employed.

The court also based its finding that Moore exhibits significant deficits in conceptual adaptive functioning largely on what it took to be his lifelong difficulty learning new skills (e.g., tying shoes, following directions, performing physical work in unison with others, riding a bicycle, driving a car).[48] None of that has anything to do with the other two skills "representative" of conceptual adaptive

---

[48] The court counted many of these difficulties a second time in the context of Moore's practical adaptive functioning, as to which the court did not find a significant deficit.

functioning, "money concepts" and "self-direction."

The district court's use of the expert testimony in the context of AAMR 10th was therefore largely guesswork, uninformed by expert guidance. Because the witnesses spoke in terms of AAMR 9th, the categories of which map onto the AAMR 10th framework imperfectly, the court's evaluation of Moore's adaptive functioning is inherently flawed.

The majority does not even acknowledge this confusion, much less suggest any means of rectifying it. Plainly, though, no matter how deferential the standard or review may be, the difference between the two AAMR frameworks makes it impossible for the panel to evaluate whether the court properly applied evidence marshaled for AAMR 9th purposes to the AAMR 10th framework.[49]

The district court had no idea what it was doing in this regard. I cannot tell whether the court guessed right, and neither can the majority. The difference is that I find the prospect of the blind leading the blind in a death penalty case disturbing enough to avoid, while the majority cheerfully accepts it. Because of the absence of expert testimony, the review the majority applies is no review at all—little more than a rubber stamp. Whether the majority's reticence

---

[49] In *Williams*, the TCCA reviewed and rejected a defendant's appeal from a jury verdict rejecting his *Atkins* claim in which, although an expert referred to the AAMR 9th categories, the jury was instructed on the AAMR 10th categories. In that case, however, the TCCA opined that the jury could have based its conclusions on grounds other than adaptive functioning—for example, the defendant's IQ—and in any case the standard of review applied to the verdict was far more deferential than is the clear error review here. *Williams*, 270 S.W.3d at 132 (evaluating whether the verdict was "so against the great weight and preponderance of the evidence as to be manifestly unjust").

In *Gallo v. State*, 239 S.W.3d 757, 778 (Tex. Crim. App. 2007), *cert. denied*, 128 S. Ct. 2872 (2008), the TCCA permitted a jury instruction defining "adaptive behavior" as "the effectiveness with or degree to which a person meets the standards of personal independence and social responsibility expected of the person's age and cultural group" instead of enumerating the categories. (The experts had used the AAMR 9th approach.) But that is merely the definition found in § 591.003 of the Texas Health and Safety Code, which the *Briseño* court largely incorporated. *Briseño*, 135 S.W.3d at 7 n.25.

flows from an exaggerated conception of the ability of generalist jurists to consider technical information themselves, a stunted reliance on the standard of review, or mere inattention, I do not know. Regardless, it is obvious that what the panel ought to have done (if it reached Moore's adaptive functioning at all) is decline to review the district court's findings and remand for evaluation of the evidence consistently with the expert testimony that may be elicited in a further hearing.

### B. The Additional *Briseño* Factors.

The *Briseño* court, 135 S.W.3d at 7 n.25, 8, acknowledged that the criteria for adaptive functioning are "exceedingly subjective" and encouraged the use of standardized tests for their evaluation. The court, *id.* at 8, also suggested a number of "other evidentiary factors which factfinders in the criminal trial context might also focus upon in weighing evidence as indicative of mental retardation or of a personality disorder":

● Did those who knew the person best during the developmental stage—his family, friends, teachers, employers, authorities—think he was mentally retarded at that time, and, if so, act in accordance with that determination?

● Has the person formulated plans and carried them through or is his conduct impulsive?

● Does his conduct show leadership or does it show that he is led around by others?

● Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?

● Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?

● Can the person hide facts or lie effectively in his own or others' in-

41

terests?

● Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?

*Id.* at 8-9.[50]

The district court acknowledged the existence of the *Briseño* factors but refused to consider their substantive application. Explaining that decision, the court interpreted *Briseño* as saying that the factors would apply only in those *Atkins* cases in which a court must decide whether a defendant is retarded or has a personality disorder. Because it did not understand the state to have argued, or presented any evidence, that Moore had such a disorder, the court considered the factors to be legally and factually irrelevant. It also said that it did not have to consider any factors not part of the AAMR test, and, lastly, it relied on the factors' being discretionary. For these reasons, it chose not to take any of the *Briseño* factors into account. *Moore v. Dretke*, 2005 WL 1606437, at *5 n.6.

The majority happily endorses the district court's conclusion, failing to recognize that none of those reasons is an adequate ground for refusing to consider the *Briseño* factors. All, in fact, contain errors of law or clearly erroneous findings of fact,[51] or at the very least indicate the court's refusal to consider "relevant factor[s] that should have been given significant weight."[52] The court's choice to

---

[50] The *Briseño* court evidently expected that these factors, being intuitively simple and nontechnical, would be helpful to courts in sorting out contradictory expert testimony concerning the "exceedingly subjective" criteria for adaptive functioning in close cases. *Briseño*, 135 S.W.3d at 8.

[51] *Ratliff v. Stewart*, 508 F.3d 225, 229 (5th Cir. 2007) (internal quotation marks omitted); *see also Unger v. Amedisys Inc.*, 401 F.3d 316, 320 (5th Cir. 2004); *Chaves v. M/V Medina Star*, 47 F.3d 153, 156 (5th Cir. 1995).

[52] *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 310 n.4 (5th Cir. 2008) (en banc) (quoting *Kern v. TXO Prod. Corp.*, 738 F.2d 968, 970 (8th Cir. 1984)), *cert. denied*, 129 S. Ct. 1336
(continued...)

disregard the *Briseño* factors is an abuse of discretion almost by definition.

To begin with, the fact that the AAMR does not mention those seven factors does not exclude their applicability in Texas law; the *Briseño* test supersedes the AAMR and is the law that controls here.[53] The TCCA can modify the AAMR definition at its discretion, and in *Briseño* it did so. The district court was wrong as a matter of law to ignore Texas state courts in this way.

The court also erred as a matter of law in saying that those factors are inapplicable where personality disorders are not at issue. *Briseño* did involve a defendant who claimed to be retarded and who the state said merely suffered from a personality disorder. Other courts have used the *Briseño* factors to make a similar distinction.[54] But the TCCA has understood or described the *Briseño* factors as being applicable in all cases,[55] and so has this court.[56] Whether the state argued or presented evidence related to personality disorders is therefore

---

[52] (...continued)
(2009). *See also Dell Computer Corp. v. Rodriguez*, 390 F.3d 377, 385 n.14 (5th Cir. 2004) ("Thus, 'when judicial action is taken in a discretionary matter,' that action may be set aside by a reviewing court if 'it has a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors.'") (quoting *United States v. Walker*, 772 F.2d 1172, 1176 n.9 (5th Cir. 1985)).

[53] *See Modden*, 147 S.W.3d at 299-300 ("[T]his Court in *Ex parte Briseño* adopted the [AAMR] criteria . . . and some other evidentiary factors in addressing *Atkins* mental retardation claims.") (citation omitted) (Henry, J., dissenting); *see also Mathis*, 483 F.3d at 397 (stating that retardation depends on the AAMR definition "and associated factors" established by *Briseño*); *Clark*, 457 F.3d at 445 ("Although the Court [in *Atkins*] did refer to the clinical definitions of mental retardation promulgated by the AAMR . . . it did not dictate that the approach and the analysis of the State inquiry *must* track the approach of the AAMR . . . exactly.").

[54] *See, e.g.*, *Williams*, 293 F. App'x at 312.

[55] *See, e.g., Hunter,* 243 S.W.3d at 666-67; *Gallo*, 239 S.W.3d at 769-70; *Modden*, 147 S.W.3d at 296 & n.12.

[56] *See, e.g., Rosales v. Quarterman*, 291 F. App'x 558, 562 (5th Cir. 2008) (per curiam), *cert. denied*, 129 S. Ct. 1317 (2009)) ("In *Briseño*, the TCCA also laid out a number of guidelines that courts can consider when making mental retardation determinations.").

irrelevant to the factors' applicability.

The district court's reliance on a legally erroneous understanding of the *Briseño* factors' scope of application constitutes an abuse of discretion and is reversible. Even if, "*arguendo* (and *dubitante*),"[57] *Briseño* did limit the application of those factors to cases in which a personality disorder is presented as an alternative to a diagnosis of retardation, the district court was plainly incorrect in saying that the state had not argued or presented evidence that Moore's adaptive functioning deficits may be caused by such a disorder. On both direct and cross-examination, Mears consistently suggested an "antisocial" personality as an alternative explanation to mental retardation.[58] That is essentially identical to the circumstances of *Briseño*, in which "the State's expert found no mental retardation but did find evidence consistent with antisocial personality disorder." *Briseño*, 135 S.W.3d at 13.

More importantly still, the district court's statement that "there is no evidence to support a finding that a personality disorder is responsible for Moore's cognitive and adaptive deficits," *Moore v. Dretke*, 2005 WL 1606437, at *5, is belied by the court's own analysis of Moore's social adaptive functioning, which deals extensively with Moore's disruptive behavior in school, social isolation, violence, and strained family relationships. Considering that both the state and the court's factual findings invited consideration of whether Moore has an antisocial

---

[57] *Puckett v. United States*, 129 S. Ct. 1423, 1431 (2009).

[58] 3 EH 223 (stating that Moore's adaptive problems are caused by antisocial tendencies, not adaptive problems in the retardation sense); 3 EH 252 (explaining that Moore is not retarded but rather is "more on the antisocial spectrum"); 4 EH 41 (distinguishing between adaptive functioning for purposes of retardation and diagnosis of antisocial personality); 4 EH 55-56 ("I think he has does have some learning disabilities [as distinguished from retardation] . . . . [The significance of a child's academic problems] depends on if the child is antisocial. . . . He may not have been motivated."); 4 EH 63-64 (state's attorney questioning Mears on the difference between "problem" or "antisocial" behavior and adaptive deficit; poor performance in school not an adaptation issue if it derives from antisocial tendencies or poor motivation)).

personality, the district court should have considered the factors set out in *Briseño* for just that purpose. In short, the court's rejection of the *Briseño* factors was "based on an erroneous view" of the law––its impression that the factors are not applicable at all––and also on a "clearly erroneous assessment of the evidence"––its failure to recognize relevant evidence at the hearing.

After one rejects the district court's first reasons for ignoring the *Briseño* factors, all that remains is the court's naked reliance on the factors' being discretionary. That, standing by itself, is not an acceptable basis for refusing to consider them. Though the TCCA has described the factors in discretionary terms, there is no Texas case in the years since *Briseño* in which the court, in the way the district court acted here, explicitly refused to consider the factors.

In fact, a review of post-*Briseño* cases shows that where Texas trial judges rather than juries make the *Briseño* analysis, they consistently—perhaps invariably—consider some or all of these factors, and the TCCA, after *Briseño*, has used almost mandatory language in describing them.[59] This court, moreover, has referred to the factors as "correct definitions of mental retardation" for purposes of the governing Texas law. *Moreno v. Dretke*, 450 F.3d 158, 164 (5th Cir. 2006). Evidence relevant to the factors was elicited in both the state trial and the federal evidentiary hearing, and all seven appear at least relevant to Moore's

---

[59] *See Modden*, 147 S.W.3d at 297 ("[T]he trial court did not use the *Briseño* factors in its findings because it did not have the benefit of our order in that case. Nonetheless, we conclude that the trial court's findings are supported by the record."); *Ex parte Elizalde*, No. WR-48957-02, 2006 WL 235036, at *3 (Tex. Crim. App. Jan. 30, 2006) (unpublished) (Johnson, J., concurring) ("In *Briseño*, this Court examined seven factors to gauge the level of an individual's adaptive functioning. However, applicant provides no evidence . . . to address any of the factors outlined in *Briseño*."). *See also Gallo*, 239 S.W.3d at 777 ("The ultimate issue of whether a defendant is mentally retarded for purposes of the Eighth Amendment ban on excessive punishment is one for the finder of fact, based upon *all* of the evidence and determinations of credibility.").

case.[60] Considering the factors' obvious centrality to the *Briseño* test and relevance to this case, together with the absence of any justification for ignoring them, the district court's choice was mere caprice—in other words, an abuse of discretion.

The district court *had no legally cognizable reason* for ignoring the *Briseño* factors, and the majority appears to recognize the precariousness of the district court's refusal to address the evidence as the TCCA intended. The majority's effort to justify that refusal, however, is nothing short of sophistic.

The majority completely disregards the district court's mistaken legal understanding of the factors' applicability. The majority does recognize the volume of evidence before the district court that was related to the factors, but the majority does not seem to understand how badly that cuts against its conclusion.[61] If there was so much evidence relevant to the factors, after all, the district court's reliance on the supposed *lack* of relevant evidence looks especially weak. Instead, the majority brazenly pretends that the district court considered the factors "implicitly."[62]

---

[60] In fact, the district court and the majority resolutely ignore the unmistakable fact that all seven of the *Briseño* factors likely weigh against Moore. The adults who knew him when he was a child were fairly unanimous that while they regarded him as mentally subaverage, they never thought he was retarded. Moore's role in his crime—including the ruse it involved and the manner in which Moore duped his co-defendants out of the proceeds and tried to shift responsibility for the victim's death—undeniably indicates a capacity for planning, leadership, and subterfuge. There was no indication that his conduct has ever been irrational. He answers questions directly and coherently, as evidenced by his interviews with Llorente, Mears, and the police after his arrest; no testimony suggested otherwise. Merely to affirm the district court bespeaks a refusal to confront that contrary evidence and its legal implications.

[61] Nor does the majority convincingly explain the fact that district court made absolutely no reference, in its opinion, to the sophistication of Moore's leadership role in the murder, one of the main elements of the state's argument regarding adaptive functioning. 3 EH 7-11.

[62] For example, the majority reads the district court as actually deciding that Moore's antisocial tendencies "did not *cause* his" adaptive deficits and that Moore's role in the crime
(continued...)

That is pure fiction. For all its elaborate deference to the district court elsewhere in its shaky opinion, the majority fails to take the district court at its word in one of its most unambiguous statements, namely: "This Court will not analyze these factors for four reasons[.]" The only acceptable reading of that language is that the district court *did not analyze those factors.* Because all of the district court's reasons are legally inadequate, there is no sense at all in the majority's concocting imaginary factual findings to which to defer.

The great irony in the majority's treatment of the evidence relevant to the *Briseño* factors is that though the majority happily endorses the district court's application of that evidence to technical psychiatric criteria that it did not understand, the majority refuses to censure the district court for failing to apply the evidence to criteria, created for judicial use, that are critical under state law. The majority has elected to rewrite an indefensible district court decision rather than review it on its own merits.

## IV. Conclusion.

In light of the record and the applicable law, the district court committed both legal and factual reversible errors in finding that Moore is retarded, for *Atkins* purposes, under Texas law. A clear-headed evaluation of the evidence in light of the correct legal standards undeniably poses a more difficult obstacle for Moore than the one he actually faced, considering his history of IQ testing and the weight of the *Briseño* factors. Because of the majority's evident indifference to state legal standards, however, that evaluation will never come.

Rather than correct the district court's undeniable errors, the panel majority washes its hands of Moore's case under the guise of respecting the clearly-erroneous standard of review. That standard, however, cannot possibly justify

---

[62] (...continued)
he committed did not affect its judgment.

47

the majority's limpness in the face of those mistakes. The effect, which must be attributed entirely to the majority itself, is to abandon any attempt to get the right result in a complex case, to leave a difficult (and still embryonic) patch of constitutional law unimproved, and to mock, on the flimsiest of foundations, the honest efforts of Texas state courts to apply *Atkins*.

The only redeeming feature of the majority's misguided opinion is that, as I noted at the outset, it is unpublished and therefore binding as precedent on no one except the parties to this case as it affects only this case. The correct resolution of these important questions, as they relate to the implementation of *Atkins* in Texas and in this circuit, must await another day and another panel. Moreover, because, under *Atkins*, the states are left to fashion their own response to that decision, the majority's mangling of Texas legal standards is subject to ready correction by the TCCA or the legislature.

I respectfully dissent.